UNITED STATES, Appellee

v

JAMES G. ADAMS, Machinist's Mate, Third Class,
U. S. Navy, Appellant

21 USCMA 401, 45 CMR 175

No. 24,437

May 19, 1972

*Lieutenant Charles W. Corddry, III*, JAGC, USNR, argued the cause for Appellant, Accused.

*Lieutenant James B. Ginty*, JAGC, USNR, argued the cause for Appellee, United States. With him on the brief was *Commander Michael F. Fasanaro, Jr.*, JAGC, USN.

## Opinion of the Court

DARDEN, Chief Judge:

The appellant stands convicted of twice willfully disobeying orders of a superior. This Court's attention is centered on questions involving speedy trial and whether the appellant was denied military due process by his command's refusal to permit him to

see counsel until almost two months after he committed his first offense.

The record shows that Adams reported aboard the U. S. S. COLLETT on September 22, 1969. The next day this ship departed for Vietnam service. The appellant, a machinist, was assigned to "main control, working on various machinery, props, evaporators." During the succeeding months the COLLETT apparently operated off the coast of Vietnam with aircraft carriers performing search and rescue operations. By February 10, 1970, however, the ship had entered Da Nang harbor, from where it would intermittently leave for fire support missions.

Because his opposition to the war had progressed to the point of his desiring conscientious objector status, Adams, on February 10, 1970, refused an order by a superior petty officer to relieve a watch, and he stated that he would do no more work while in the war zone. Charge II and its specification are a consequence of this refusal. Accused of misbehaving before the enemy, Adams was brought before a captain's mast, where the circumstances of the incident were presented. Not until May 14, 1970, did he face formal charges.

On February 24, just before the ship departed Da Nang harbor, Adams' application for conscientious objector status was perfected and mailed to the Chief of Naval Personnel. The COLLETT arrived at Subic Bay about the 28th of February and departed about the 4th of March. During this period in port Adams was removed from the ship and confined ashore. According to the ship's executive officer, this was done for Adams's own protection, to preclude sabotage, and to insure his presence to face charges. Adams described his cell as worse than solitary confinement—it consisted of a brick floor and walls, with no conveniences. He was not permitted to stand or lean against the walls but had to sit in the middle of the floor. After he re-embarked, the ship stopped en route to the United States for four hours at

**402**

Guam (refueling) and overnight at Pearl Harbor. It reached Long Beach, California, on March 23, 1970.

Adams asserted that while the ship was underway to the United States he laid tile in the Chief's quarters and cleaned his own living area. He refused proposals that he work as a cook, yeoman, or compartment cleaner. According to prosecution evidence, he returned to a full duty status in early April in compliance with his request. After United States forces entered Cambodia, Adams refused an order by a ship's officer on May 12, 1970, "to report to Main Control to carry out his duties." This refusal is the subject of the willful disobedience alleged under Charge I, specification 1.

The record reveals further that after his refusal to obey the February order, Adams was told that he would be restricted to the ship until it returned to the United States. At one time he was prohibited from entering engineering spaces. But while at Da Nang he was escorted ashore for interviews by a psychiatrist and a chaplain that are prerequisites for the processing of conscientious objector applications. The COLLETT'S executive officer maintained that at one point in Da Nang Adams could have consulted a lawyer. But Adams testified that he did not know this opportunity existed and was therefore unaware of his entitlement. His version is that when he asked to see counsel as a part of his going to Da Nang he was told that his visit concerned only his conscientious objector status. Adams said he wanted to consult a lawyer at this time because he was unhappy about being charged with disobedience and thought he was being treated unfairly. He said that when he made a similar request before going ashore at Subic Bay, the reply was that he could see a lawyer while in the brig. He testified that in the brig he put in a daily request to consult a lawyer but was informed it was not customary for "someone in safekeeping to see a lawyer." At Guam, he again, sought legal counsel, but this time he said the response was that this was impossible

because of his ship's short stay. At Pearl Harbor a similar request resulted in the same answer. When the COLLETT finally docked at Long Beach, Adams received a two-hour pier liberty. A day or two later he asked for and received liberty to seek legal assistance. He was escorted at first, but later the area to which he was restricted was expanded beyond the ship to include the entire naval station. On April 6 all restriction against him was lifted.

Adam's conscientious objector application had been forwarded to the Chief of Naval Personnel with a request that it be acted on before a formal processing of "military infractions." Under normal Bureau of Naval Personnel procedure, disciplinary action is not stayed pending action on such an application. On the COLLETT'S arrival at Pearl Harbor the ship's officers received a reply from Washington directing them to proceed with the disciplinary action first. This decision the ship appealed by speed letter the following day. A reply received shortly after the ship's arrival at Long Beach reaffirmed the original instruction.

Over a two- or three-week period that followed, the ship's officers sought the advice of the station legal assistance group, gathered information on a possible court-martial, and appointed an Article 32 officer. They also made a formal request for appointment of Government counsel. Despite the investigating officer's difficulty in securing legal assistance, room space, and necessary equipment, the Article 32 proceeding began May 15, 1970. Adams was transferred to the naval station after completion of the Article 32 investigation. At the end of May the COLLETT put out to sea for a week, and from June 22 until August 5 the ship was on a "midshipman's cruise." On August 11 the case was referred to trial.

On the speedy trial issue the parties stipulated to the following events:

| | |
|---|---|
| "15 May 1970 | Pretrial investigation began. |
| 22 May 1970 | Pretrial investigation completed. |
| 26 May 1970 | Commanding Officer, USS COLLETT, endorsed pretrial investigation report. Report forwarded to Commander, Cruiser-Destroyer Force, Pacific Fleet. |
| 2 Jun 1970 | Report received in office of COMCRUDESPAC. |
| 3 Jun 1970 | Endorsement prepared by CAPT SIEFERT, Staff Judge Advocate, for signature of COMCRUDESPAC. |
| 8 Jun 1970 | COMCRUDESPAC discussed case with CAPT SIEFERT. |
| 10 Jun 1970 | (Approximate date) CAPT SIEFERT requested chronology from USS COLLETT. |
| 18 Jun 1970 | (Approximate date) Chronology received from USS COLLETT. |
| 18 Jun 1970 | Report endorsed by COMCRUDESPAC. |
| 19 Jun 1970 | Case file received at COMELEVEN. |
| 22 Jun 1970 | Case referred to trial counsel for writing of Article 34 Advice. |
| 22 Jun 1970 | USS COLLETT began six week deployment. |
| 28 Jul 1970 | Article 34 Advice received in office of District Legal Officer, Eleventh Naval District Headquarters. |
| 5 Aug 1970 | USS COLLETT returned from deployment. |

| | |
|---|---|
| 7 Aug 1970 | Endorsement prepared referring case back to USS COLLETT. |
| 7–11 Aug 1970 | Discussions of case between District Legal officer and Commandant, Eleventh Naval District. |
| 11 Aug 1970 | Case referred to trial by General Court-Martial. |
| 14 Aug 1970 | (Approximate date) Trial counsel, defense counsel and military judge agree upon trial date of 4 September 1970." |

Appellate defense counsel attacks the lapse of seven months from first offense to trial as being inexcusably long. In his view, Article 10, Uniform Code of Military Justice, 10 USC § 810, was flouted. He depreciates any intent of the ship's officers to help Adams by attempting first to secure action on his conscientious objector status; he counters that the ship's command encouraged harassment of him, hindered his attempts to secure a transfer, and was indifferent to the conditions of confinement at Subic Bay. Appellate defense counsel also asserts that inaction dating from the COLLETT'S arrival at Long Beach on March 23 until just before the Article 32 investigation on May 15 and the three-month delay from the completion of the pretrial investigation report until trial were inexcusable. Trial counsel's explanation that pretrial advice required five weeks is unimpressive to the appellate defense counsel, because the pretrial advice is only two pages long. The ship's deployment during this time was not a cause of the delay in the preparation of this advice, since the trial counsel was not attached to the ship.

The military judge found no deliberate delay that prejudiced Adams. Rather he commended the ▮ efforts of the command in attempting first to obtain a decision on Adams's application for an administrative discharge. We, too, credit the command for having sought a decision that could have obviated court-martial action. Terming delay for such a purpose prejudicial would hardly be accurate. But we vigorously condemn those responsible for the conditions of Adams's confinement at Subic Bay, even if the declared purposes of that confinement were the real ones. The military judge must have had the same opinion, as he noted that if sentencing became necessary he would consider the circumstances of the confinement as a mitigating factor. Other considerations that contributed to the delay are the unfamiliarity by the officers of a small combatant ship with the criminal law process and its requirements, difficulty experienced by the command in securing legal assistance ashore, and the assignment of a trial counsel attached to another command who was already acting as defense counsel in twenty-three other cases. These are circumstances that contribute to a determination of the reasonableness of a delay. United States v Mladjen, 19 USCMA 159, 41 CMR 159 (1969).

In this instance immediate steps were not taken to try Adams after his first disobedience of orders. Charges were not forwarded within eight days afterward, nor was an explanation of the reasons for a longer delay forwarded. See Articles 10 and 33, Uniform Code of Military Justice, 10 USC §§ 810 and 833. For the purposes of Articles 10 and 33, some precedents treat restriction as to the equivalent of confinement. *Compare* United States v Williams, 16 USCMA 589, 37 CMR 209 (1967), *with* United States v Smith, 17 USCMA 427, 38 CMR 225 (1968). If restriction and confinement are equivalent for these purposes, error occurred in this case. But, "[i]n the absence of a pretrial confinement so long as to be wholly unreasonable and inexplicable or of other circumstances constituting prejudice per se," the lack of prejudice may be shown. United States v Burton, 21 USCMA 112, 116, 44 CMR 166 (1971).

While the COLLETT was at sea Adam's freedom differed little from that of his mates. He had no liberty in port, but not many such opportunities existed for any member of the crew during the first part of the period with which we are concerned. At Long Beach he regained his complete freedom. The submarginal conditions of his incarceration at Subic Bay have already been credited in mitigation by the military judge who determined sentence. The hostility of the crew toward Adams apparently sprang not from his being subject to court-martial charges but from his unwillingess to perform any part of a mission in a combat zone, where the burdens were the same for those who believed in the cause and those who had reservations about it.

Adams knew that he might be court-martialed. We have discovered no way in which his defense to the charges suffered because of the delay. The military judge's ruling on the speedy trial motion was within the limits of his discretion.

On the availability of counsel, the defense contention is not that Adams was entitled to appointment of counsel before referral of charges to trial but that Adams should have been allowed to confer with a lawyer after he requested this.

Rule 5 of the Federal Rules of Criminal Procedure requires that any person arrested be taken without undue delay before the nearest available magistrate, who must inform him of the complaint, of his right to retain counsel or to request assignment of counsel if he is indigent, and of his right to consult with counsel. No exact counterpart to this appearance before a magistrate exists in military law.

The decisions of the Supreme Court of the United States on when the right to counsel attaches have applied to cases in which civilians were defendants. The Constitution has been construed to require appointment of counsel for an indigent "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." Mempa v Rhay, 389 US 128, 134, 19 L Ed 2d 336, 88 S Ct 254 (1967). In essence, a civilian "accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. The security of that right is as much the aim of the right to counsel as it is of the other guarantees of the Sixth Amendment." United States v Wade, 388 US 218, 226–227, 18 L Ed 2d 1149, 87 S Ct 1926 (1967). To our knowledge, the absence from military law of a provision for a prompt appearance before a magistrate or a comparable official has not been held to violate the Constitution. We assume, without deciding, that an accused member of the armed forces is entitled to the *assistance*, not necessarily the appointment, of counsel at any " 'critical' stage" of the proceeding against him. United States v Wade, supra, at 224.

A civilian is not entitled to appointment of counsel at every step from the time he becomes a suspect to indictment. United States v Halley, 431 F2d 1180 (CA 9th Cir) (1970), certiorari denied, 401 US 916, 27 L Ed 2d 816, 91 S Ct 896 (1971), rehearing denied, 401 US 1004, 28 L Ed 2d 540, 91 S Ct 1239 (1971). The Sixth Amendment right to counsel is not automatically triggered by "the mere fact of custody." United States v Davis, 399 F2d 948, 951 (CA 2d Cir) (1968), certiorari denied, 393 US 987, 21 L Ed 2d 449, 89 S Ct 465 (1968).

Under the Uniform Code of Military Justice, the right to appointment of military counsel does not exist before the filing of charges. United States v Moore, 4 USCMA 482, 16 CMR 56 (1954); United States v Hounshell, 7 USCMA 3, 21 CMR 129 (1956); United States v Tempia, 16 USCMA 629, 37 CMR 249 (1967). This Court has held on constitutional grounds that a military suspect undergoing custodial interrogation must be advised of his right to the presence of counsel, one

retained by him or one appointed without expense to him. United States v Tempia, supra.

Before the *Tempia* decision this Court several times had declared that a suspect subjected to interrogation had "a right to consult with a lawyer of his own choice or with the Staff Judge Advocate." United States v Gunnels, 8 USCMA 130, 134, 23 CMR 354 (1957); United States v Rose, 8 USCMA 441, 24 CMR 251 (1957); United States v Wheaton, 9 USCMA 257, 26 CMR 37 (1958).

Considering that Rule 5(b), Federal Rules of Criminal Procedure, has no analogue in the military judicial system, a strong argument can be made for a broadening of *Gunnels* to require the right of consultation with counsel at earlier stages of a court-martial proceeding, in addition to situations involving custodial interrogation. While Article 10, Uniform Code of Military Justice, 10 USC § 810, speaks of immediate steps to be taken upon arrest or confinement to try the accused or to release him, an accused in the armed forces is without bail rights. Levy v Resor, 17 USCMA 135, 37 CMR 399 (1967). In United States v Przybycien, 19 USCMA 120, 41 CMR 120 (1969), we noted the value of assistance of counsel during extended confinement. A person not ▆▆▆▆▆▆ ▆ confined who faces a strong possibility of being charged ought to have an opportunity to consult a lawyer when this is practical.

The short stay of the COLLETT at Guam and Pearl Harbor is a reasonable explanation of why Adams was not permitted to talk with a lawyer at either of those places. No understandable or acceptable reason has appeared for ignoring Adam's request at Subic Bay or Da Nang. But we are convinced that denying him consultation with counsel had no material effect upon the progress or the result of Adams's court-martial. He was afforded counsel for his defense at every "'critical' stage," United States v Wade, supra; he conceded the inaction that constituted the disobedience. Since this is a case in which Adams had no complaint about his legal assistance at trial, the strict rule of Glasser v United States, 315 US 60, 86 L Ed 680, 62 S Ct 457 (1942), eschewing nice calculations of prejudice, is inapplicable.

We affirm the decision of the United States Navy Court of Military Review.

Judge QUINN concurs.

DUNCAN, Judge (dissenting):

My review of the record leads me to conclude that the Government has not shown by the evidence that it was impracticable to permit the accused to consult with counsel upon request. I see no reason why he could not have been afforded the opportunity to consult counsel at Subic Bay while ashore and confined from February 28 to March 4. Such a procedure deprived the accused of a fundamental and essential right, the denial of which offends a well-ordered system of justice. See my expressed view on the subject of the right to consult counsel as stated in United States v Mason, 21 USCMA 389, 45 CMR 163 (1972). I would reverse the decision of the Court of Military Review.