UNITED STATES, Appellee,

v.

Victor A. GRANDY, Private, U. S. Army, Appellant.

Dkt. No. 39092/AR.
SPCM 13785.

U. S. Court of Military Appeals.

July 20, 1981.

Appellant: *Captain Charles E. Trant* (argued); *Lieutenant Colonel John F. Lymburner, Major Elliot J. Clark, Jr.* (on brief); *Colonel Edward S. Adamkewicz, Jr.*

Appellee: *Captain Rexford T. Bragaw, III* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Captain Paul K. Cascio* (on brief); *Captain Stephen D. Smith.*

## Opinion of the Court

EVERETT, Chief Judge:

Appellant was tried in Germany by a special court-martial, with enlisted members, on a charge of "unlawfully receiv[ing] a money bag containing quarters, dimes, nickels, and 17 Deutsche Mark, of a value of about $327.00, ... which ... he ... then well knew had been stolen," in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. Despite his pleas of not guilty, he was convicted and the court sentenced him to a bad-conduct discharge, confinement at hard labor for 2 months, and forfeiture of $135 pay per month for 2 months. The convening authority approved the findings and sentence. In turn, the United States Army Court of Military Review (Garn, J., dissenting) affirmed.

This Court granted (9 M.J. 209, A.C.M.R.) review of these three assigned errors:

## I

THE EVIDENCE OF RECORD IS INSUFFICIENT AT LAW TO SUPPORT A CONVICTION FOR THE OFFENSE OF RECEIVING STOLEN PROPERTY.

## II

THE APPELLANT WAS SUBSTANTIALLY PREJUDICED BY THE IMPROPER ARGUMENT OF TRIAL COUNSEL ON FINDINGS.

## III

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT IN MISSTATING AND SLANTING THE EVIDENCE OF RECORD IN INSTRUCTING THE COURT–MARTIAL PANEL ON FINDINGS.

This issue was specified by the Court:
WHETHER THE INSTRUCTION ON REASONABLE DOUBT IS ADEQUATE AND SUFFICIENT.

## I

An understanding of the granted issues requires a detailed examination of the evidence offered at trial. In proving this case, the Government first called as a witness PFC Michael Patton, a member of appellant's company, who testified that on August 27, 1978, he had stolen a bag of coins from a station wagon. Next, he took the coins—approximately $327.00 in value—to his room and called in another member of the company, PFC Yanez, to whom he had showed the loot. According to Patton, he had told Yanez, "I got it from the candy man and he looked at me and laughed." Then, the two soldiers had gone to Yanez' room and started counting the coins. After a while Patton, who apparently had been drinking heavily, left the room and he did not see the coins again until the next afternoon. At that time they were on a bed in Yanez' room and were covered by a blanket. The white bag about 12 inches long, which had contained the coins when Patton had committed his theft, was also there in the room.

At this time Grandy was standing in the doorway of Yanez' room. He and Patton proceeded to wrap many of the coins into rolls, which they ultimately placed in an attache case. During this time, according to Patton, appellant had handled the white bag which had originally contained the coins. Appellant arranged with Specialist Four Rory Durden, another member of the unit, to drive him and Patton from Gelnhausen, where they were stationed, to the nearby town of Hanau. At some point, they stopped at a bank to attempt to change the coins for paper currency; but after they were unsuccessful they proceeded to the American Express office in Hanau for the same purpose.

Patton conceded on cross-examination that he had never told appellant the source of the coins. Indeed, he had only stated to Yanez that he had obtained the money from "the candy man." When asked why he had left the coins with Yanez, whom he knew only by name, Patton explained that Yanez was from his home town. He had merely told Yanez, "here is the money," when they were counting it before Patton had gone back to his room to sleep. Patton conceded that he was testifying pursuant to a promise by the convening authority that he would not receive a bad-conduct discharge. He "thought that maybe Yanez had told" appellant about the money "because Grandy was rolling the coins." Patton had been sitting in the back seat of Durden's car and Grandy in the front on their trip to Hanau; so appellant "just got out and walked into the bank" without any prior discussion between the two of them.

Next testified Mr. Albert Lucas, a self-employed businessman, who had been the victim of the loss. He estimated that between $600.00 and $800.00 had been stolen from his car. Then, Christine Morris, a teller at American Express in Hanau, described how appellant had come to her window at about 2:00 p.m. on the afternoon of August 28, 1978. Grandy, who seemed "very nervous and fidgety," had told her that he had some coins to exchange, and then had written on each roll of coins an account number and name. While they were doing this, appellant had remarked to her about having been earlier at another bank in Fliegerhorst, where a teller had refused to exchange the coins. Because there was "such a large amount" of coins, and appellant had given her a Gelnhausen account number, Mrs. Morris had reported the events to the head teller, Joyce Bird. Just before Mrs. Morris had talked to Mrs. Bird, appellant had said he needed to go to the bathroom; and, since there was no bathroom for customers there at the American Express office, "he went outside the bank and said he would be back in a little while." When he had departed at this point he had taken his attache case, in which he had originally brought the coins to her teller window; but he did not bring the case back when he returned from his purported mission. The money, meanwhile, had still been at her window.

According to Mrs. Morris, the head teller had asked appellant to step over to her office; but, instead of immediately complying, he had gone back out the bank door, with Mrs. Bird in his wake. The coins still remained at her window in the cash drawer, since Mrs. Bird had instructed her not to pay the coins until some information received early that day could be checked. In all, the coins which Grandy wished to exchange aggregated $260.00 in value—composed of 20 rolls of quarters and $60.00 worth of dimes.

Joyce Bird, the chief teller for American Express in Hanau, testified that prior to the time when she had seen appellant on the afternoon of August 28, she had received a call from the Criminal Investigations Division (CID) requesting her to look out for a large deposit or for a large amount of coins being traded in. In turn, Mrs. Bird had informed the other tellers to notify her if anybody turned in coins, "because I'd like to talk to them." After Mrs. Morris had brought to her attention that someone was there with a large amount of coins, Mrs. Bird—who mistakenly believed that he wished to deposit the coins, rather than exchange them—asked Grandy "if he was making a unit fund deposit. I believe he said yes." She noted that the coins had a Gelnhausen account number, whereupon she told appellant that she "had to do something for a minute" and called the CID agents to come to the bank.

When at some point Mrs. Bird had requested Grandy to go to her office, he went out of the bank instead, and she followed him to the door. "As I was standing there Mr. Pierce pulled up in the car and at that time the gentleman returned and Mr. Pierce and I escorted him back into the bank and into the office." Upon further questioning about her first conversation with appellant, Mrs. Morris testified that, after noting the account number marked on the wrappers of the various rolls of coins

was a number for a savings account, she had asked Grandy if the coins were "a unit deposit." In his response, "I thought he said something, mumbled yes or something like that"; "I was under the impression that it was some kind of unit deposit." Mrs. Bird also amplified her earlier testimony by stating that, while she was outside the bank looking for appellant, Mr. Pierce, the CID agent, had arrived; and she had told him that she did not know where appellant had gone. Then, however, "within a few minutes" Grandy came back around the corner; and when he stepped up to her, she asked him to come into the bank with Mr. Pierce, to which request he acceded without resistance.

CID Special Agent Herbert T. Harwell, Jr., testified that he was assigned at the Gelnhausen branch office and, in connection with an investigation, had searched the room occupied by Private Yanez and Cole. This search had "revealed a white canvas type money bag containing $58 and . . . 35 cents in nickels, dimes and quarters and 17 one mark coins," the coins being in the bag and not in rolls. On cross-examination, Special Agent Harwell admitted that Grandy did not live in the room and that the bag "had no personal private markings" and no bank name thereon.

After the Government rested its case, Sergeant Lonnie Parker, appellant's section Sergeant, was called as a defense witness to testify that appellant was truthful and that he would believe Grandy under oath. Next, the appellant took the stand. He testified that, when they were in guard formation together on the morning of August 28, Yanez had told him about the coins and had asked if appellant could exchange the coins for him. When he declined "because [he] had to go to Hanau," Yanez then "said . . . why don't you cash it in up there." Yanez did not state whence the coins had come; and appellant had believed that they belonged to Yanez. According to Grandy, it had never crossed his mind that the coins might be stolen, "because, first . . . [Yanez] had this big artillery shell he kept change in . . . [and] second of all if it was stolen, he would have told me," since they were pretty good friends.

Appellant himself had obtained from American Express in Gelnhausen the wrappers for the coins. He and Patton had started wrapping the coins in preparation for their trip to Hanau with Durden. However, appellant had not "learned that the coins had been stolen." Concerning his attempt to cash the coins at Hanau, Grandy gave this description:

I walked up to the teller and she said—I said I wanted to cash in some change. She asked how much is it and I said about $260. I pulled out the rolls and gave them to her and she said we'd have to put my bank account number on it so we know that it is the right number of coins in there. So I went into my wallet and got my bank card and wrote my bank account number on there. She told me to wait a minute. So I said okay and she went over to the other lady and came back and said "just a minute." I asked was there a bathroom and she said "no." So I went back outside and went around to the snack bar. Then I went to Durden's car said it might be a minute and told him to wait so I went to the snack bar and came back and went into the bank. She said—I believe she said to step over here. Then I went outside to see Durden to see if he could wait a little while longer because he was saying he had to hurry up and get back because he had to go on guard duty.

Appellant claimed that he had gone back into the bank voluntarily and had been sitting there when Special Agent Pierce appeared. Moreover, he denied that he had seen a money bag in Yanez' room. Although the coins were in a brief case which Patton had provided, appellant had not asked Patton why he was helping with the coins. According to Grandy, he "thought Yanez probably asked him to help him wrap the coins." Appellant testified that he, rather than Patton, took the coins into the American Express office to be exchanged "[b]ecause Yanez asked me to cash them in" and he planned to give the money to Yanez after the exchange.

On cross-examination, appellant denied that he had never indicated to anyone that the money involved was intended for a "unit fund," or that he had gone to Hanau because he had believed "that the Gelnhausen office would be closed." He stated that he had offered Durden $10.00 to take him to Hanau. Disputing Patton's testimony to the contrary, appellant claimed that Patton had seen Yanez. Also, Grandy contradicted Mrs. Bird's testimony that she had stopped him outside the bank.

Specialist Four Rory L. Durden, who was called as a defense witness, had known appellant about a year and a half and had given Patton and him a ride to Hanau. He denied that Grandy had paid him any money for the ride, although he stated that Grandy "was supposed to pay me ten dollars." When Grandy had approached him about taking them to Hanau, it was around lunch time and appellant had not said why he wished to make the trip. Enroute to Hanau, they had stopped at Fliegerhorst at Patton's request. The first time that Durden had seen the black attache case containing the coins was after they had stopped at a snack bar near American Express. While they waited there, apparently, Grandy proceeded to the American Express office; and during his absence Patton had told Durden that the coins were stolen. Durden also testified that he had given other persons rides from Gelnhausen to Hanau on various occasions.

Special Agent Harwell, recalled by the Government as a rebuttal witness, testified that appellant had voluntarily told him that Durden and Patton had gone into a snack bar at Hanau while Grandy had entered the bank with the money in the attache case. Moreover, in this oral statement to Harwell, appellant had "said he told the cashier that they were unit funds that he was changing." Then Captain Mraz, also a member of appellant's company, took the stand to describe appellant's bad reputation for truth and veracity. Closing the government's rebuttal, First Sergeant Wilson of appellant's company similarly downgraded appellant's reputation for truth and veracity. Moreover, in connection with appellant's testimony that Yanez had in his room an artillery shell canister in which he kept change, First Sergeant Wilson stated that, although he had seen the canister in Yanez' room for some six months and had even put his own cigarettes into the canister, he had never seen any money in that shell canister.

In surrebuttal, appellant testified that he had not given any statement, written or oral, to Special Agent Harwell.

II

■ To convict appellant of receiving stolen coins, it was necessary, as recognized by all parties at the trial, that the Government establish beyond reasonable doubt that appellant knew the coins had been stolen. Grandy's possession of coins that had been stolen the day before and which he was attempting to exchange into currency would at first glance seem adequate to establish the requisite element of knowledge. However, in attacking the sufficiency of the evidence, appellant now emphasizes that PFC Patton, the admitted thief of the coins, testified as a government witness that he never told appellant about the theft and had not even revealed specifically to Yanez what had been the source of the coins. Moreover, Yanez had not been called as a witness by either party.

Even though PFC Patton was called as a prosecution witness, the Government did not vouch for every portion of his testimony. It is a familiar principle—often referred to in instructing court members—that they may believe all or any part of a witness' testimony. Thus, they were free to disbelieve Patton's testimony that he had never informed appellant about the source of the funds. Indeed, they might have inferred that Patton was seeking to protect Grandy by disclaiming the transaction of any information to him that the coins were stolen.

Moreover, the inference of guilt from appellant's possession of recently stolen property is fortified by other evidence. Regardless of whether appellant was "very nervous and fidgety," as Mrs. Morris testified,

his traveling from Gelnhausen to Hanau to exchange the coins for currency—rather than attempting to make such an exchange at Gelnhausen—is a damaging fact. Furthermore, appellant's cause was not helped by his explanation that he was to pay Durden $10.00 from his own pocket for taking him to Hanau so that he could perform a favor for Yanez.[1] The testimony of Mrs. Morris and Special Agent Harwell indicates that appellant misrepresented that the coins he wished to exchange had come from a "unit fund"; and this deception can be interpreted as part of a pattern of concealment which suggests guilty knowledge on Grandy's part.

Other contradictions also constitute circumstances tending to suggest Grandy's guilt. For example, there was evidence directly in conflict with his sworn testimony that he had not seen the white canvas bag which had originally contained the stolen coins; that Yanez habitually kept coins in an artillery shell casing in his room; and that he had been sitting inside the bank when CID Agent Pierce appeared. At the least—and in light of appellant's bad reputation for truth and veracity—the members of the court-martial were not obligated to believe appellant's explanations of his possession of the recently stolen coins.

Under the circumstances, we must conclude "that the record contains competent and credible evidence from which [the court members] 'could find, *beyond a reasonable doubt,* the existence of every element' of the offenses charged." *United States v. Arias,* 3 M.J. 436, 438 (C.M.A.1977). *See United States v. Taylor,* 21 U.S.C.M.A. 220, 222, 44 C.M.R. 274, 276 (1972). Accordingly, issue I is without merit.

### III

■ In a brief opening argument, trial counsel stated that appellant had indicated to Mrs. Morris that the coins were being exchanged to obtain currency "for a unit fund which is *pretty much the only thing that American Express cashes coinage of*

*that large amount."* (Emphasis supplied.) Trial counsel continued: "At this time the accused again leaves and as the evidence is shown he goes outside and she follows him and then he is *apprehended* outside the American facility Bank." (Emphasis supplied.)

Appellate defense counsel now contends that the trial counsel's reference to "unit fund" transactions as "pretty much the only thing" for which American Express would cash coinage of such a large amount was completely unsupported by the record. Moreover, he complains that "apprehended" is a term of art in military law—a term with which the prosecutor should have been well acquainted—and that the evidence does not support an inference that Grandy was "apprehended."

Neither of these comments by the prosecutor was challenged at the time—an omission on the part of trial defense counsel which supports the inference that, even if erroneous, such allusions were deemed at the time to be of little consequence. *United States v. Horn,* 9 M.J. 429 (C.M.A.1980). Secondly, with respect to the reference to apprehension, the government's evidence suggests that CID Agent Pierce arrived while appellant was still outside the bank and that some type of restraint on his freedom was then imposed—even though not a restraint which reached the level of apprehension.[2] When we look at the trial counsel's argument in context and note the defense's failure to object, the rather inconsequential nature of the misstatements by the prosecutor, the absence of any indication that the prosecutor was intentionally misstating the evidence, and the unlikelihood that the improper argument would have inflamed or influenced the court members, we must conclude that appellant suffered no prejudice from the misstatements by trial counsel. Issue II is likewise without merit.

### IV

■ We cannot reach a similar conclusion as to the military judge's instructions,

---

1. The testimony of appellant and Durden was somewhat at odds as to the financial arrangement they had made.

2. It is very doubtful that the CID agent would have had probable cause to apprehend at that stage.

which appellate defense counsel have attacked as being slanted and one-sided. The instruction of which appellant especially complains is this:

First of all, and foremost, when you come as court members you are not expected to leave common sense out that door. You are expected to come with a little common sense. And *the biggest factor you have in this case here is, was Grandy told by Yanez "I'm on duty today. Here is $320. in coins. Would you wrap it" first of all on your day off, because he had the day off because he was on guard duty. Would you wrap it first of all and then change that into money? Not doing it here, but driving to another place even though you don't have a car.* You should consider that. A very important factor. There are some other important facts in the case. First of all there is the testimony of Grandy that he did not have the knowledge. But remember the instruction as to deliberately avoiding the question of knowledge. *Also we have the question of the shell. The testimony of the defendant is that his friend Yanez has a shell in his room and in this shell they keep $320. in coins, a very common occurrence.* But the first Sergeant indicated that he had looked in that room *many many* times and saw *no money, no money, not $320 but no money.* Also bear in mind that the evidence in this case, you may believe, I don't know, you may believe that the evidence in this case shows that it was between 600 and 800 dollars total. Maybe what happened is there was 600 to 800 dollars. Would you trade in every bit of money? Would Patton trade in every bit of money that was stolen, or would they hold some out? *You have the evidence in this case that the defendant had bags that were marked with a bank stamp on them. The defendant denies that. Consider both of them. Also consider that the sack that was marked with the mint number or with Philadelphia marking, whatever you find the evidence to be, was hidden, found hidden in that room.* Consider the fact that the defendant took his day off to wrap the money, obtain the wrappers, take it down to another city. Consider the fact that he appeared nervous and fidgety. Consider the fact that he said that no one told him that the money was stolen from the time they started counting the money until after he came out of the bank, the defendant's testimony. No one ever mentioned it. You have to consider that. *Testimony that he left the bank without getting the money, that he had to be brought back in.* How was that? Was it actually some sort of flight that was consciousness of guilt? Or, how about Mrs. Bird's testimony here on redirect? Does it indicate any flight at all that is consciousness of guilt? Then on the other hand they didn't talk about going to the bank, some of the testimony. Other testimony we have is that they talked about—For that matter they didn't talk about where they were going to go until they got down in Hanau and then somehow they got to a bank. I'm not quite clear on that. You decide how they got to the bank on that. Remember when Patton took the money. He did not tell—He told Yanez he got it from the candy man. Yanez's response was what? A laugh. That the money was changed from sacks to an attache case. What does that indicate? Also consider his reaction at the bank. *The fact that at the bank he at least nodded his head according to the testimony of one of the witnesses and indicated the money was from the unit fund.* Would an individual say it's from the unit fund if they knew it rightfully was taken from the shell in the room? That the money was on the bed under a blanket. Those are some of the facts. The weight, if any, to be given an inference that the accused knowledge must, of course, depend upon the circumstances intending to prove facts which give rise to the inference as well as all the other evidence in the case. It is for you to make this determination.

(Emphasis added).

Paragraph 73c of the Manual for Courts-Martial, United States, 1969 (Revised edition), directs:

In summarizing or commenting upon the evidence, the military judge should use the greatest caution to insure that his remarks do not extend beyond an accurate, fair, and dispassionate statement of what the evidence shows, both on behalf of the prosecution and the defense. He should not depart from the role of an impartial judge, or assume the role of an partisan advocate. He should not assume as true the existence or nonexistence of a material fact in issue as to which the evidence is conflicting, as to which there is dispute, or which is not supported by the evidence, and he should make it clear that the members of the court are left free to exercise their independent judgment as to the facts.

In his dissent in the Court of Military Review, Judge Garn indicated his agreement "with the substance of the appellant's argument" that here the judge's comments on the evidence did not comply with the Manual standard. He observed:

On balance, the military judge's summary of the circumstantial evidence emphasized the evidence favorable to the prosecution's theory of the case. Moreover, his summary indicated that several facts, favorable to the prosecution, had been established, even though the evidence tending to establish those facts was unclear or controverted, or both. Furthermore, the military judge interspersed his summary of the evidence with several questions and some sarcastic remarks tending to disparage evidence favorable to the defense.

In like manner, our reading of the comments by the military judge suggests that, while he was attempting to comply with the principle that instructions should be "tailored" to the evidence, he failed to do so in an even-handed manner. Indeed, in some respects the marshaling of the evidence in favor of the Government would do credit to a prosecutor's argument. However, our scrutiny of the instruction does not reveal a corresponding effort to marshal the evidence in support of any defense theory.

The defense counsel failed to object to the instructions that were given. In many instances, such failure would be fatal to a client's cause. See, e. g., United States v. Salley, 9 M.J. 189 (C.M.A.1980). However, there have been instances of instructional omission when we have felt that the error was so plain that waiver would not be invoked. See, e. g., United States v. Lell, 16 U.S.C.M.A. 161, 36 C.M.R. 317 (1966); United States v. Stephen, 15 U.S.C.M.A. 314, 35 C.M.R. 286 (1965). Although, there are jurisdictions in which a judge may virtually instruct a jury to bring in a verdict of guilty, military justice has opted for neutrality on the part of the military judge. This policy, implemented by paragraph 73c of the Manual, concerns a basic right of an accused. Moreover, the violation of that policy can be especially prejudicial for, while court members expect counsel to be advocates—and on that basis presumably discount some of their argument—the expectation of impartiality on the part of the judge is so great that, when he does take sides, the members can hardly avoid being influenced substantially by his advocacy. Also, we recognize that, as a practical matter, it often is easier for a counsel to identify and object to a misstatement of law in a judge's charge than to identify and object to a slanted charge.

We recognize too that in the case at bar the military judge gave the court members a general instruction that they "must disregard any comment or statement made by me during the course of the trial which may seem to indicate an opinion as to guilt or innocence of the accused for you alone have the independent responsibility of deciding that issue." This general exhortation certainly helps avoid prejudice to an accused from a judge's misstatement of evidence—an error which can readily occur even with innocent intentions and with the most capable judge. However, it is not a sufficient antidote for an extensive summary of evidence by the judge whose logical

tendency is to persuade the court members to convict.[3]

Early in this opinion we explained why the evidence received at the trial was sufficient to establish guilt. However, we cannot say that the evidence itself was so one-sided that it compelled the court members to find guilt. For example, PFC Patton, the admitted thief, testified as a government witness that appellant had not been informed that the coins were stolen. Also, some of Grandy's conduct at the American Express office—such as giving his name and account number—does not conform to the actions of a person seeking to dispose of stolen coins. Thus, if the court members had acquitted, we could not have viewed their findings as unreasonable. However, the instruction of the military judge tended to remove any last vestige of hope for the appellant, not because all the evidence of record pointed unerringly to appellant's guilt but, instead, because the trial judge reviewed that evidence for the court members in a manner which would have persuaded them of appellant's guilt without providing equal treatment for the evidence which might have tended to exonerate. Under these circumstances we must reverse.[4]

## V

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

COOK, Judge (concurring):

Contrary to the dissenting judge's position, I do not find that my opinion in *United States v. Clark*, 7 M.J. 178 (C.M.A.1979), requires that this case be affirmed. The military judge in *Clark* noted various factu-

al conclusions when he advised the court members that he had made a preliminary ruling on the admissibility of accused's pretrial statement. The accused argued before this Court that the specific reference to the factual conclusions improperly influenced the court members in their determination of the voluntariness of the pretrial statement. We rejected the defense position because the military judge also instructed the members that he had resolved only the preliminary issue of admissibility; that the members had to resolve the ultimate issue of voluntariness; and they were not to be influenced by his preliminary ruling. He meticulously detailed the defense evidence as to the lack of voluntariness; advised the court members that they must be satisfied beyond a reasonable doubt that the accused did not sign the pretrial statement for the reasons indicated by defense evidence; advised them on the matter of voluntariness; and four times repeated his admonition not to be influenced by his preliminary ruling. On the basis of the foregoing, I concluded that the accused had not been prejudiced.

The present case comes to us in a totally different posture. As the Chief Judge notes in his opinion, this was a closely contested case. The evidence was not overwhelming, but the military judge summarized it in a manner very favorable to the Government. I do not believe that a general instruction to ignore his summarization could dissipate the prejudice introduced by his one-sided evaluation. Accordingly, I concur.

FLETCHER, Judge (dissenting):

I find my disagreement with My Brother Judges limited to the resolution of Issue III:

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT IN MISSTATING AND SLANTING THE EVIDENCE OF

---

**3.** We recognize that, if the evidence of guilt is overwhelming, it is difficult for a judge to comply with the requirement of tailoring his charge to the evidence and yet not seem to be a partisan of the prosecution. Under such circumstances compliance with paragraph 73c, Manu-

al for Courts-Martial, United States, 1969 (Revised edition), may hinge largely on the manner in which the military judge words his instruction.

**4.** It is unnecessary to decide the specified issue.

RECORD IN INSTRUCTING THE COURT–MARTIAL PANEL ON FINDINGS.

"In the absence of evidence indicating otherwise, a jury is presumed to have complied with the instructions given them by the judge." *See United States v. Ricketts,* 1 M.J. 78, 82 (C.M.A.1975).[1]

The lead opinion avoids the above quantum of the law. With sagacity, the opinion makes no reference to *United States v. Clark,* 7 M.J. 178 (C.M.A.1979), which I believe resolves the question against the appellant.

I would affirm the decision of the United States Army Court of Military Review.

---

1. In the present case, the military judge instructed the court members that his comments were not evidence in the case. Moreover, he instructed the members that they must independently determine the facts of the case according to their own recollection of testimony. Finally, he particularly instructed the members to disregard any comment or statement by him which indicates his opinion of guilt or innocence of the accused.