## UNITED STATES

v.

**Brent C. WATTENBARGER, 489 66 1073, Mess Management Specialist Third Class (E-4), U.S. Navy.**

**NMCM 82 0461.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 23 Sept. 1981.

Decided 26 April 1983.

CDR Matthew J. Wheeler, JAGC, USNR, Appellate Defense Counsel.

CAPT W.J. Ciaravino, USMC, Appellate Defense Counsel.

LCDR W.A. Dorsey, JAGC, USNR, Appellate Government Counsel.

Before CEDARBURG, C.J., and GORMLEY and MIELCZARSKI, JJ.

CEDARBURG, Chief Judge:

At his general court-martial before members, appellant was convicted of assault with intent to commit rape, assault with a means likely to produce grievous bodily harm, and housebreaking in violation of Articles 134, 128, and 130, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 934, 928, and 930, respectively. The members sentenced appellant to a reduction to pay grade E-1, total forfeiture of pay and allowances, confinement at hard labor for 5 years, and a bad conduct discharge. Of eleven assignments of error raised on review, we believe that five warrant discussion (I, II, IV, VII and IX). A recitation of the facts of the case is necessary.

On 3 December 1980 Mrs. P, a Navy dependent, was alone in her apartment in base housing located approximately five miles from the U.S. Naval Communication Station, Harold E. Holt, Western Australia. Around 2230 that evening her dog growled at something outside of the rear sliding glass doors of the apartment. Seeing no one outside, Mrs. P decided to go to bed. At 0030, 4 December, Mrs. P was awakened by her dog's barking and a constant knocking at her front door. Clad in a floor length robe she went to the door, turned on the porch light, and asked who was there. She thought she heard the person respond "security," so she opened the door to find appellant, whom she recognized as one of the galley workers on base, standing in the doorway with a knife. Mrs. P detected the slight odor of alcohol and noticed appellant look over his shoulder as if someone were chasing him. Appellant then grabbed Mrs. P around the shoulders and put the knife to her neck, prompting her to scream. Telling her to "shut up," appellant threw Mrs. P to the floor, began to choke her and, straddling her, warned in a very loud, harsh whisper that if she ever told a soul about this, he would kill her. Appellant stopped strangling Mrs. P to ask where her husband was, and when she responded that her husband was on duty, he ripped her robe open, began to strangle her again and said "if you understand, you kick your feet." Mrs. P kicked her feet, and appellant said, "Get your clothes off and turn off that light." Appellant got up and headed for the light switch, at which time Mrs. P jumped up and ran out the door to a neighbor's house across the street. Appellant chased her briefly before returning to the apartment where Mrs. P noticed her porch light go off and on.

Later that morning appellant was brought into the Exmouth Police Station because he fit the description given by Mrs. P of her assailant. He immediately identified a pair of boots which had been found outside the sliding glass door of Mrs. P's apartment as his own. In response to ques-

tions by Sergeant Roy Harper of the Exmouth Police Department, appellant stated that he remembered nothing that happened the previous night. He then remembered going to a local inn at 8:00 p.m. and leaving about 11:22, but stated that he could not remember anything after leaving the inn. Informed of a report from base security that appellant had tried to place an overseas phone call to his mother around midnight, appellant explained that he recalled trying to place the call and reaching a wrong number. In response to Sergeant Harper's further questions, appellant stated that he remembered having three or four beers at the inn and was feeling "a little bit drunk" when he left.

Appellant was arrested by the Australian authorities that morning and placed in confinement at the Exmouth Police Station until 9 December. Sergeant Harper testified that during this period, appellant's behavior seemed normal except for one afternoon during the 110°F heat when appellant appeared to be in a semi-catatonic state, refusing to drink, converse, or display any emotion. Sergeant Harper carried him into the air-conditioned station where he tried to get appellant to drink some water. Lieutenant Commander Theodore F. Smyer, Medical Corps, U.S. Navy, and Commander C. Dudley Saul, Medical Corps, U.S. Navy, were called to examine appellant. Dr. Smyer, who had interviewed and examined appellant a couple of weeks prior to the assault, testified that while he was taking appellant's pulse, appellant stuck his thumb up and gave Dr. Smyer a big wink. Within a couple of minutes, appellant was feeling okay, leading Dr. Smyer to believe that appellant had been malingering.

Appellant was transferred to the base security department at Harold E. Holt where he was confined from 9–22 December. On 12 December, the station judge advocate advised appellant of his rights to counsel at an Article 32, UCMJ, investigation. On the rights to counsel form used by the station judge advocate, appellant wrote "I desire no cousel [sic] at this time. BCW." Appellant subsequently requested to consult with counsel and, on 17 Decem-

ber, refused to clean his cell until his request was granted. On 19 December Commander Kenneth Karols, Medical Corps, U.S. Navy, conducted an examination of appellant pursuant to paragraph 121, *Manual for Courts-Martial, 1969 (Rev.)*. Dr. Karols concluded that appellant was incompetent to stand trial, diagnosing him as having a manic-depressive illness in the manic phase, severe but not psychotic, and recommended four weeks of psychiatric treatment. Dr. Karols' diagnosis was based on his extensive examinations of appellant, as well as interviews with Mrs. P and each person who had observed appellant's behavior during the evening preceding and the morning following the assault. He had also consulted Dr. Smyer and Dr. Saul about their examinations of appellant and interviewed Lieutenant Commander Gary J. Cragun, Chaplain Corps, U.S. Navy, whose counseling of appellant led to his suspicion of a mental disorder and precipitated the referral of appellant to Dr. Saul and Dr. Smyer a couple of weeks prior to the assault.

On 22 December appellant was transferred to Tripler Army Medical Center, Hawaii, where he underwent psychiatric observation until 24 January 1981. A second 121 board was held on 13 January which concurred with the diagnosis of Dr. Karols, resulting in the recommendation that appellant be transferred for further psychiatric treatment. From 25 January to 10 March, appellant underwent psychiatric evaluation at National Naval Medical Center, Bethesda, Maryland. On 10 March a third 121 board found appellant competent to stand trial, so he was transferred to the Marine Corps Brig, Quantico, Virginia, and then to Guam, the situs of trial. Appellant first consulted with counsel in Guam on 26 March, at which time he was released from confinement and placed in a restricted status. An Article 32, UCMJ, investigation was initiated on 20 May, concluding on 9 June; trial was commenced 16 September, ending 23 September.

At trial the defense offered extensive evidence demonstrating a history of mental

disorder in appellant's family and documenting repeated psychiatric counseling and institutionalization of appellant as a youth. The defense also called several witnesses and offered several stipulations of testimony which clearly showed that appellant had a very troubled, unstable childhood characterized by repeated psychiatric counseling, unusual behavior, and grandiose ideations. The defense called Colonel T.J. Chamberlain, Medical Corps, U.S. Army, an extensively qualified, experienced psychiatrist who sat on the three-member 121 board which examined appellant in late January 1981 at Tripler Army Medical Center. Based on psychiatric testing of appellant, review of his family history, and close observation of appellant for approximately 20 days while at Tripler, but without the benefit of any of the statements from the people who observed appellant's behavior on or around 4 December, the board unanimously concluded that appellant suffered from a chronic, moderate manic-depressive affective disorder. The board also unanimously concluded that at the time of the offense appellant was intoxicated on alcohol, lacked the substantial capacity to appreciate the criminality of his conduct, lacked the substantial capacity to conform his conduct to the requirements of the law, and lacked the capacity to form a specific intent. These opinions were based on the legal test for insanity adopted in *United States v. Frederick*, 3 M.J. 230 (C.M.A.1977). The defense also introduced the results of a three-member 121 board held on 19 August at Naval Regional Medical Center, Guam. That board found that appellant suffered from an alcohol induced organic mental disorder at the time of the offense but was inconclusive as to any clinical diagnosis or as to appellant's mental responsibility at the time of the offense.

In rebuttal the Government called Dr. Karols and offered the report of his psychiatric evaluation of appellant in late December, 1980. Dr. Karols, also an eminently qualified and experienced psychiatrist, agreed with the diagnosis of Dr. Chamberlain that appellant suffered from a manic-depressive mental disorder. However, from his consultations with Chaplain Cragun, Dr. Saul, and Dr. Smyer, and his interviews of the persons who had observed appellant on the night of the assault and during his period of confinement, Dr. Karols concluded that appellant did not lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law on the night of the assault. He testified further that he believed appellant did have the capacity to form a specific intent at the time of the offense.

The stipulated testimony of Electronics Technician Second Class Eric Hood indicated that he, appellant, and one other man shared 6–9 pitchers of beer between 1900 and 2230 on 3 December at the Pot Shot Inn, and that when appellant left the inn, he was capable of carrying on a conversation but his speech was off. Electronics Technician Third Class Ernest Johnson testified that he saw appellant around 2300 on 3 December when appellant came to the guard shack on base to place an overseas call. Johnson testified that appellant talked quite a bit, at one point stating that he needed something to eat in order to sober up before calling his mother. Johnson, however, opined that appellant did not appear to have any trouble walking or talking. Johnson also testified that appellant seemed normal when he returned to the base the following morning except that he was wearing no shoes.

I

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

II

APPELLANT WAS DENIED HIS RIGHT TO A SPEEDY TRIAL.

A delay in providing an accused legal representation violates that accused's rights to counsel under the Sixth Amendment to the United States Constitution if he was denied counsel at any "critical stage" of the proceedings against him. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United*

*States v. Adams,* 21 U.S.C.M.A. 401, 45 C.M.R. 175 (1972). Even where no critical stage arises, an accused's rights to counsel may be violated if the delay in providing counsel is contrary to the requirements of fundamental fairness. *United States v. Jackson,* 5 M.J. 223 (C.M.A.1978).

In determining when a critical stage arises in the criminal prosecution of an accused, the Supreme Court has stated that:

> [T]he principle of *Powell v. Alabama* [287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1964)] and succeeding cases requires that we scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

*United States v. Wade,* 388 U.S. at 227, 87 S.Ct. at 1932. After examining the pretrial identification procedure at issue in *Wade,* the Court held that a critical stage did arise due to the inherent risks of improper influence that exist in those procedures, the inability of an accused to recognize and correct such improprieties where they exist, and most importantly the inability of an accused to reconstruct the procedures at trial and meaningfully confront the witnesses against him. The basic concern of the Court in determining when a critical stage arises is whether the absence of counsel at that stage might derogate from the accused's right to a fair trial.

Appellant asserts that *Timmons v. Peyton,* 360 F.2d 327 (4th Cir.1966), is closely on point with the case *sub judice* and requires reversal of his conviction. In *Timmons v. Peyton,* however, the appellant, having confessed to murder, was committed to a mental institution pursuant to the Government's request for a determination of his mental responsibility at the time of the offense as well as his competency to stand trial even though the former determination was not authorized by state law. Because appellant was not provided counsel for 3½ months, the Court overturned the conviction because (1) the absence of counsel for 3½ months hampered the accused's ability at trial to present psychiatric evidence and effectively cross-examine psychiatric witnesses against him, (2) the accused had a history of psychiatric problems and was of almost moronic mentality, and (3) the accused had the burden to prove his insanity beyond a reasonable doubt. The Court considered the third factor to be the most persuasive. Unlike the accused in *Timmons v. Peyton,* appellant had no burden to prove his insanity. Furthermore we can find no indication that appellant was hampered in the presentation of his insanity defense as that issue was fully and competently litigated.

 Since pretrial confinement alone does not constitute a critical stage of the accusatory process which entitles an accused to the assistance of counsel, *United States v. Jackson, supra* (accused in pretrial confinement for 42 days before counsel appointed), and finding no substantial risk that the absence of counsel during appellant's psychiatric evaluation and treatment derogated from appellant's right to a fair trial, we conclude that no critical stage arose which entitled appellant to the appointment of counsel under the Sixth Amendment.

██ In determining whether a delay in the appointment of counsel violates the requirements of fundamental fairness, the most important factor to consider is whether the accused suffered any prejudice as a result of the delay. In *Jackson* the Court concluded that since the accused was charged nine days after confinement and "his somewhat ambiguous requests to consult with counsel were ultimately satisfied," *United States v. Jackson, supra* at 225, the availability of counsel was fundamentally fair. The Court, although declining to formulate a static rule for the assignment of counsel, stated that "fundamental fairness

calls for such representation of all prisoners confined for more than a brief period of time." *Id.* at 227. Without further expansion on what constitutes a "brief period of time," the Court, stating that the delay of 42 days was potentially prejudicial, found in the record no indication of prejudice to the defense caused by the delay and thus refused to overturn the conviction in that case. The Court also found that the trial defense counsel had effectively waived the issue of fundamental fairness of counsel appointment by failing to raise the issue at trial when the military judge specifically questioned him regarding his preparation of the case. In *United States v. Adams, supra,* the Court of Military Appeals refused to overturn the conviction of an accused whose requests for counsel went unheeded for two months while he was in restriction, stating that "No understandable or acceptable reason has appeared for ignoring Adam's [sic] request [for counsel] at Subic Bay or Da Nang. But we are convinced that denying him consultation with counsel had no material effect upon the progress or the result of Adam's [sic] court-martial."

Contrary to the case in *United States v. Adams, supra,* where the Court found no "understandable or acceptable reason" for the delay in the appointment of counsel, the record in the present case indicates that both practical, logistical considerations and the uncertainty regarding the ultimate determination of appellant's mental state delayed the assignment of counsel to appellant. We have no doubt that an attorney probably could have been helpful to appellant and certainly comforting if appointed immediately, but we find that appellant suffered no substantial risk of prejudice as a result of the delay. Thus we conclude that appellant was not denied the effective assistance of counsel in this case.

■ The factors which caused the delay in the appointment of counsel are the same factors which caused the major delay in the commencement of trial. It was not until 10 March 1981 that appellant, while in National Naval Medical Center, Bethesda, Maryland, was determined to be competent to stand trial. Especially considering the logistical problems faced by the Government in holding trial in Guam, the location of the officer exercising general court-martial authority over appellant's command, a functional analysis of all of the factors involved in the delay convinces us that the Government proceeded with reasonable diligence and without deliberate oppression of the accused or lack of concern for the requirement of expeditious prosecution. *United States v. Hagler,* 7 M.J. 944 (N.C.M.R.) *pet. denied,* 8 M.J. 172 (C.M.A.1979). Thus appellant was not denied a speedy trial.

### IV

### THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT APPELLANT'S SANITY AT THE TIME OF THE OFFENSE.

■ Once the issue of an accused's mental responsibility is raised, the Government has the burden to prove beyond a reasonable doubt that the accused was mentally responsible at the time of the offense. *United States v. Martinez,* 12 M.J. 801 (N.M.C.M.R.1981) *pet. denied,* 13 M.J. 232 (C.M.A.1982). An accused is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. *United States v. Frederick,* 3 M.J. 230 (C.M.A.1977).

As previously noted, there was a direct conflict in the psychiatric evidence presented by the two eminently qualified psychiatrists, Dr. Karols, who examined appellant and interviewed witnesses approximately 15 days after the date of the offense, and Dr. Chamberlain, who sat on a three-member 121 board approximately 40 days after the offense. Appellant argues that the testimony of Dr. Chamberlain was sufficient to establish a reasonable doubt as to his mental responsibility and urges us to set aside the findings and sentence.

Where there is a conflict of expert testimony on the issue of sanity, and even where the defense offers uncontradicted medical testimony, it does not necessarily follow that reasonable men must entertain a reasonable doubt as to the accused's sanity. "A finding of guilty, which includes a finding of sanity contrary to expert opinion, can be sustained if it is supported by substantial evidence." *United States v. Carey*, 11 U.S.C.M.A. 443, 29 C.M.R. 259 (1960). The opinions of the experts do not necessarily define the scope of the responsibility of the court-martial. The members must consider and weigh all of the evidence presented. *Id.* In analyzing the two contrary expert opinions, we examine the important factors which formed the bases of those opinions such as the professional qualifications of each expert, the duration and depth of observation and evaluation by each expert, the length of time elapsed since the offense and each examination, and the extent of other background materials and data considered. *United States v. Bush*, 14 M.J. 900 (N.M.C.M.R.1982). In weighing the two expert opinions offered in the case *sub judice*, even keeping in mind that Dr. Chamberlain's board reached a unanimous conclusion, the most significant distinction is the fact that Dr. Karols relied heavily on the observations by many witnesses of appellant's behavior preceding, during, and following the night of the assault, data which was not considered by Dr. Chamberlain's board. We do not believe that Dr. Karols' lack of an extensive family history of appellant was particularly significant since both experts agreed that such data is most useful in reaching a diagnosis but not as important in reaching a conclusion about behavior at any specific time.

A number of factors in the record, particularly appellant's use of a knife, his apparent stealth and planning of the assault, his attempts to conceal his conduct, and his threats to Mrs. P convince us that appellant fully appreciated the criminality of his conduct and possessed the capacity to conform his conduct to the requirements of the law. We are satisfied that Dr. Karols' opinion, plus the other testimony presented as to appellant's behavior, constitutes substantial evidence of his sanity sufficient to convince us beyond a reasonable doubt that he was responsible for his criminal conduct.

## VII

THE MILITARY JUDGE'S PRESUMPTION DURING THE FINDINGS INSTRUCTIONS THAT THE ASSAULT, AS ALLEGED IN CHARGE II, OCCURRED, DENIED APPELLANT THE PRESUMPTION OF INNOCENCE.

The military judge, during his instructions on the elements of the offenses, instructed the members to consider all relevant facts and circumstances including the testimony of Mrs. P regarding the acts and statements of the accused "during the time of the assault on her." The military judge's use of the word "assault" in that instruction is the basis for this assignment of error.

In *United States v. Gaiter*, 1 M.J. 54 (C.M.A.1975), the Court of Military Appeals overturned a conviction based on erroneous instructions by the military judge in which he concluded that the accused had sold drugs despite the accused's testimony to the contrary. Although there was no objection at trial, the Court refused to apply the doctrine of waiver, because the incorrect instruction was on a material issue. In the case *sub judice*, the issue of whether or not an assault occurred was essentially conceded at trial as evidenced by the reference by the trial defense counsel at least twice in his closing argument to Mrs. P's "assailant." We find no fair risk that prejudice could have resulted to appellant from the military judge's instructions. The possibility of prejudice was further diminished by the general exhortation later in the instructions that the members should disregard any comment by the military judge which would seem to express his opinion as to the guilt or innocence of the accused. *United States v. Grandy*, 11 M.J. 270 (C.M.A.1981).

## IX

THE APPELLANT WAS SEVERELY PREJUDICED BY THE INFLAMMATORY COMMENTS AND MISSTATEMENTS OF FACT AND LAW MADE BY THE TRIAL COUNSEL DURING THE FINDINGS AND SENTENCING ARGUMENTS IN A CONTESTED MEMBERS TRIAL.

In her argument on findings, the trial counsel argued that Dr. Smyer gave his opinion that appellant "knew right from wrong." She also argued at several points that appellant knew right from wrong and, at one point, apparently equated the *Frederick* and *M'Naghten* [*M'Naghten's Case,* 10 Cl. & F. 200, 8 Eng.Rep. 718 (H.L.1843)] standards of mental responsibility: "nor did it render him incapable of appreciating the criminality of his conduct, in other words, appreciating wrong from right...." Appellant contends that this amounted to a misstatement of law by the trial counsel. Appellant also contends that the trial counsel made a misstatement of the evidence by arguing that Dr. Chamberlain testified that the "*only* reliable diagnostic tool to predict whether or not at a given point in time an accused lacked substantial capacity, based on this disease, was to observe his behavior at the time" (emphasis added). Appellant contends that this combination of errors was so prejudicial that it warrants reversal of his conviction despite the absence of any objection at trial.

The trial counsel was correct in summarizing Dr. Smyer's testimony that in his opinion appellant knew right from wrong. Although this opinion may have been irrelevant, there was no objection at trial. The trial counsel did improperly equate the *Frederick* and *M'Naghten* standards of mental responsibility; however, in the absence of any objection and in light of the military judge's very clear instructions on mental responsibility, we perceive no risk that the members were persuaded to apply an improper standard. Dr. Chamberlain agreed on cross-examination that "the only really reliable way to determine whether or not a person is manic-depressive is to actually observe his behavior." There-

fore the trial counsel's interpretation of Dr. Chamberlain's testimony was not so incorrect that it should be characterized as a misstatement of fact.

In her sentencing argument, the trial counsel argued strongly that general deterrence should be a factor in the members' deliberations; yet, she did not argue general deterrence to the exclusion of other factors. Considering the absence of any objection at trial and the military judge's instructions on sentencing, and comparing the adjudged sentence with the maximum authorized sentence, *United States v. Lania,* 9 M.J. 100 (C.M.A.1980), we are convinced that the members did not give undue consideration to the theory of general deterrence in adjudging a sentence.

We find that the remaining assignments of error are without merit. Even considering the psychiatric testimony in mitigation, we further find that the sentence is appropriate in light of the egregious nature of the assault. Thus we conclude that no error materially prejudicial to the substantial rights of appellant was committed. Accordingly we affirm the findings and sentence as approved on review below.

Judge GORMLEY and Judge MIELCZARSKI concur.