**UNITED STATES, Appellee,**

v.

**Lyle B. SHACKELFORD, Private, U. S. Army, Appellant.**

No. 31,589.
SPCM 10411.

U. S. Court of Military Appeals.

Sept. 17, 1976.

---

Captain Derryl W. Peden argued the cause for Appellant, Accused. With him on the brief were Colonel Alton H. Harvey, Lieutenant Colonel James Kucera, and Captain John C. Carr.

Captain Lee D. Schinasi argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Donald W. Hansen, Major John T. Sherwood, Jr., and Captain Jonathan D. Glidden.

## Opinion of the Court

FLETCHER, Chief Judge:

We granted review to resolve whether the trial judge abandoned his impartial role and became a partisan advocate for the prosecution during the appellant's contested trial by special court-martial. Private Shackelford initially pleaded guilty to a 5-week AWOL charge;[1] however, during the judge's inquiry into the providence of his plea, it became apparent that the accused believed a major portion of his absence was, in fact, authorized by his unit commander.

In pertinent part, the accused related that he originally had been granted 2 weeks leave and was due to return on March 9, 1974. On March 8th, he contacted his executive officer who granted him a 7-day extension. Two days later, he telephoned his unit commander and advised him that his sister was in the hospital and that he was needed there for three to four additional weeks. According to Private Shackelford, his commander told him if he provided a statement from the doctor to this effect, the requested leave extension would be approved. A letter specifying a 3-week period was sent by the family physician but never was received by the company commander, according to the accused. Private Shackelford later acknowledged that his commander had "told [him] to give him a ring back to let him know . . . if everything was okay . . . about the letter and so forth." The accused also agreed that "by [his] not corresponding with [his unit commander] at all . . . this is the reason why he put [him] AWOL as of 18 March." To explain the additional AWOL time, the accused recalled that it was consumed driving back to Texas from his home in California after getting his new car repaired following an automobile accident.

The trial judge properly rejected the tendered guilty plea. See Article 45(a), Uniform Code of Military Justice, 10 U.S.C. § 845(a). See also United States v. Jemmings, 1 M.J. 414 (1976); United States v. Timmins, 21 U.S.C.M.A. 475, 45 C.M.R. 249 (1972). In entering a plea of not guilty for the accused, he stressed:

I certainly do not consider myself to be disqualified from continuing to preside over your trial on a judge alone basis because . . . all the information I

---

1. Appellant was acquitted of a charge alleging breach of restriction.

have received to this point . . . is in your behalf. There is nothing damning to you about the information I have received so I've gotten no improper knowledge of this case.

■ The trial judge quite correctly allowed the appellant to reevaluate whether he wished to be tried before judge alone or jury, and the appellant opted for the latter. During his subsequent trial on the merits before a court with members with the same military judge presiding,[2] Private Shackelford elected to testify in his own behalf. His testimony was substantially similar to that previously elicited by the judge during the providence inquiry with two notable exceptions. First, the accused denied during cross-examination that his commander ever had told him to check back to make sure the physician's letter arrived. Second, Private Shackelford failed to mention his car repair difficulties in either direct or cross-examination.

Following 23 questions to Private Shackelford by his counsel and 51 questions on cross-examination, the trial judge entered the fray with 29 questions of his own.[3] The judge's questioning prompted 14 additional questions by the prosecutor followed by 22 additional questions by the trial judge to resolve 3 questions posited by the jury. Trial defense counsel's objection to the manner in which the judge was proceeding was not even acknowledged. While the tenor of the trial judge's questions rather than their bare number is the more significant factor, the sheer number of searching questions directed to the accused, without similar inquiries of the other witnesses, tended to highlight for the court members the judge's concern with the accused's credibility.

"[W]hether a given question or line of questioning is designed primarily to clarify issues and elicit facts or to underline incon-

sistencies and elicit admissions must be decided in the light of the whole trial, for each question is usually not objectionable on its face." *United States v. Switzer*, 252 F.2d 139, 144 (2d Cir. 1958), *cert. denied*, 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958). We are in agreement with the Second Circuit that:[4]

It is difficult for an appellate court to determine from a reading of words spoken at trial whether questions by the judge had the effect of unfairly disparaging the defense. We are not given the benefit of witnessing the juxtaposition of personalities which may help prevent reading too much into "the cold black and white of a printed record."

In *United States v. Clower*, 23 U.S.C.M.A. 15, 18, 48 C.M.R. 307, 310 (1974), we commented on the tightrope over which a trial judge must tread in assuring on the one hand that the jury is provided the information it needs while also scrupulously avoiding even the slightest appearance of partiality:

The role of impartiality of a military judge is particularly important in a close case . . . where defense success depends upon the acceptance of the truthfulness of appellant's testimony by the court members. " 'The influence of the trial judge on the jury is necessarily and properly of great weight,' *Starr v. United States*, 153 U.S. 614 [14 S.Ct. 919, 38 L.Ed. 841] and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word." *Bollenbach v. United States*, 326 U.S. 607, 612 [66 S.Ct. 402, 90 L.Ed. 350] (1946).

■ We believe the trial judge crossed the line of propriety in this instance. As was stressed in *Clower*, it is common among jurors "to attempt to tune in on and adopt a

2. With regard to the appropriateness of and necessity for recusation in circumstances such as these, *see United States v. Cockerell*, 49 C.M.R. 567, 570–73 (A.C.M.R.1974).

3. The flavor of this examination and its prosecutorial tone is best illustrated by quoting it. A representative portion of the trial transcript

has been reproduced in the appendix to this opinion.

4. *United States v. Grunberger*, 431 F.2d 1062, 1067 (2d Cir. 1970), *quoting United States v. Ah Kee Eng*, 241 F.2d 157, 161 (2d Cir. 1957).

trial judge's appraisal of the facts. . . . Extreme caution must be observed to prevent a joinder of an exposure of a trial judge's view of the facts and a juror's natural curiosity about an affinity for that view from causing any abandonment of each juror's personal factfinding responsibility." 23 U.S.C.M.A. at 18, 48 C.M.R. at 310. In a similar vein, the Fifth Circuit has held:[5]

> While that method of cross-examination if it had been conducted by the district attorney, might have been proper, a . . . judge ought never assume the role of a prosecuting attorney and lend the weight of his great influence to the side of the government. It is the judge's duty to maintain an attitude of unswerving impartiality between the government and the accused, and he ought never in any questions he asks go beyond the point of seeing to it, in the interests of justice, that the case is fairly tried. . . . It is too much to expect of human nature that a judge can actively and vigorously aid in the prosecution and at the same time appear to the layman on the jury to be impartial.

■ Our conclusion that the appellant was denied a fair trial is buttressed by the fact that much of the judge's questioning appears to have been prompted by information which he gleaned from the providence inquiry. Indeed, there were glaring inconsistencies in the accused's two versions of the facts. When the accused modified his story before the jury, the trial judge was placed in the untenable position of knowing the accused was hedging on the truth, unbeknownst to the jury, while also being barred by canon 3 of the Code of Judicial Conduct from taking sides. *See also* ABA Standards, The Function of the Trial Judge §§ 1.5, 6.4 (1972). Such a turn of events serves to illustrate the unforeseen risks which often accompany a refusal to step off

a case once on notice of a version of the facts to which the actual factfinders are not entitled to be privy.[6] *See* ABA Standards, The Function of the Trial Judge § 1.7 (1972).

Believing, as we do, that the accused was denied a fair hearing as a result of the judge's questioning, the decision of the U. S. Army Court of Military Review is reversed. The findings and sentence are set aside; a rehearing may be ordered.

Judge PERRY concurs.

## APPENDIX

Q And it was your understanding then that if you did get a letter from the doctor that the C.O., would grant any type of extension that the doctor asked for?

A Yes, sir, the only thing he wanted was a letter from the doctor. He just wanted the facts, how many days I wanted, how many weeks I wanted. This is what he wanted from the doctor.

Q So if that doctor had said you had needed to be there for five days you would have had five days leave extended or if he said you were needed to be there for ten weeks, you would have had ten weeks leave extended?

A Well, if you put it that way, sir, that's what he was saying. In essence, he was saying, whatever the doctor said. Well, it's sort of exaggerated. I see your point but whatever the doctor said.

Q No, please don't get me wrong. I'm not trying to argue with you. I'm trying to see your position. So your company commander, Lieutenant Chiasson, left you with the distinct understanding that what the doctor ordered was what you were going to get?

---

**5.** *Hunter v. United States*, 62 F.2d 217, 220 (5th Cir. 1932); *accord, United States v. Lowe*, 11 U.S.C.M.A. 515, 519, 29 C.M.R. 331, 335 (1960).

**6.** It would violate the spirit, if not the letter, of Article 45(a), Uniform Code of Military Justice, 10 U.S.C. § 845(a), to utilize evidence procured

during a guilty plea inquiry to later convict or impeach an accused whose plea was rejected. *United States v. Barben*, 14 U.S.C.M.A. 198, 33 C.M.R. 410 (1963); *see Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927).

A  Right, I'd made mention it was going to be about three or four weeks and he said, "Well, if you don't have a doctor's statement, in other words, I want you back here," and I said, "Well, I will get that doctor's statement." I had made mention of it to the executive officer.

Q  All right, fine, fine. But you were left with the distinct understanding that it was Lieutenant Chiasson's position that what the doctor said, you were going to get and you thought it would be something like three to four weeks?

A  Yes, sir.

Q  It was your understanding that four weeks would be the maximum that you would be taking and the doctor would authorize, is that correct?

A  Yes, sir.

Q  In this connection, I note from the calendar that there are five weeks between the 18th of March and the 22nd of April. Now would you care to explain your statement that you felt a maximum of four weeks would be appropriate and authorized and it was five weeks before you got back here?

A  Well, that can be explained to the point where when I was in California I purchased a car and after we received the letter and my father talked to the First Sergeant my father told me that he told him that I would be on my way as quick as possible so I—it was in April when I purchased the car—so my sister had the car and she wrecked it so that delayed me for about four or five days. I had to put the car in the shop. She agreed to pay for it and so forth and as soon as it was fixed I left that Friday and returned here Monday morning, early Monday morning. This is why it was extended that long.

Q  Now, when in relation to this four or five weeks did you receive this letter saying you were AWOL and your father phoned the company?

A  It was within a week of my returning back to Fort Sam.

Q  So it was then probably around the 15th of April?

A  Yes, sir.

Q  A week before you returned?

A  Yes, sir.

Q  All right, if the letter arrived and it was confirmed over the telephone and the company did consider you to be AWOL and this came to your attention on the 15th of April, why didn't you, for example, return by air which could have been done in one day rather than waiting for the car to be fixed to come back?

A  Well, I would have had a problem trying to get it. First of all, I didn't have any transportation down here and that was one of my reasons for going home too, was to purchase a car, which I did because the car I had here had broken down and my father said, "Well, when you come here, we'll fix something up for you," so it would have been a problem if I had just flown on back and left the car there because I'd have to turn around and go pick it up so that's why I got the car out of the shop and it took me from Friday until Monday to get here by car. In the conversation with the First Sergeant my father said, "Well, since he is AWOL I will see that he gets back to the unit," so I left the following week.

Q  So you took an extra week after being advised that you were AWOL in order to get the car fixed?

A  Yes, sir.

Q  Now there's another point here, a couple of other points, one, you indicated that it was agreed upon between you and the company commander that what the doctor ordered is what you were going to get and that would be the leave period that the C.O., would authorize. Why didn't you check with the doctor to find out what he had requested so

that you would know whether it was one week, two weeks, three weeks, four weeks as this was going to be controlling  .  .  .

A   Well, after I saw the letter, it said three weeks, but when I talked to the doctor on Friday and we discussed it I said three to four weeks so I was under the assumption that this would, you know, be in the letter.  My sister got the carbon copy about a week or two after it was sent on the 11th.

Q   Well, once again, I'm not trying to argue with you, but you say it was your understanding from talking with the doctor and the C.O., one, that anything the doctor ordered would be okay with the C.O., and two, you were talking to the doctor about three to four weeks.  Now three weeks versus four weeks would make a difference of one week AWOL.

A   True.

Q   Why didn't you check to find out whether he said three weeks or four weeks?

A   Partly on my not checking it out.  I don't know why I didn't but I was under the assumption that I had that time granted thinking that's what he put down.  I had spoken with him at the hospital in San Francisco on Friday.  So, that's an oversight on my part, I assume.

Q   One final point, you indicated that you assumed that everything was going to be fine because the C.O., Lieutenant Chiasson, had assured you over the telephone that anything the doctor ordered was all right with him and you didn't have to check back.  You also went on to testify, however, that Lieutenant Chiasson, in that same conversation, was rude to you and hung up on you.

A   Yes, sir.

Q   Can you explain—to me there's a little difference here.  One, he's being friendly and helpful and two, he's rude and hanging up.

A   Well, we had some verbal differences.  The company commander and I just don't see eye to eye.  That's all there is to it and I was talking to him and he said, "Shackelford, I want you here," and I was trying to explain to him that I couldn't and he said, "The only thing I want is a letter.  In other words, you're AWOL," boom, that was it.

Q   But in spite of this attitude you didn't feel that you were required on the one hand to check back with him to see if he'd received the letter or, two, to check with the doctor to find out whether or not he'd asked for the extension for you and if so, how much?

A   After my sister, she had conversed with the doctor, you know, he had made mention that the letter was sent.  I assumed that it was.  .  .

COOK, Judge (concurring in the result):

I do not share the majority's certitude that the trial judge "crossed the line of propriety" to assume the role of prosecutor.  *See United States v. Kimble*, 23 U.S.C.M.A. 251, 253, 49 C.M.R. 384, 386 (1974), which distinguished *United States v. Clower*, 23 U.S.C.M.A. 15, 48 C.M.R. 307 (1974), by pointing out that if, after the accused has been examined by both trial and defense counsel, his testimony still remains uncertain and inconclusive, it is "proper and fitting" that the trial judge examine him.  However, I believe that the judge's utilization of incriminatory admissions made by the accused during the earlier inquiry, which resulted in rejection of the proffered plea of guilty, was improper and prejudicial to the accused.  *United States v. Barben*, 14 U.S.C.M.A. 198, 33 C.M.R. 410 (1963).  For this reason, I join in the disposition directed by the majority.