# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**M.D. MODZELEWSKI, F.D. MITCHELL, J.A. FISCHER**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**DUSTIN D. KISH**
**STAFF SERGEANT (E-6), U.S. MARINE CORPS**

**NMCCA 201100404**
**SPECIAL COURT-MARTIAL**

**Sentence Adjudged:** 6 June 2012.
**Military Judge:** LtCol Robert G. Palmer, USMC.
**Convening Authority:** Commanding Officer, First Marine Corps District, Eastern Recruiting Region, Garden City, NY.
**Staff Judge Advocate's Recommendation:** Col E.R. Kleis, USMC.
**For Appellant:** LCDR Ryan C. Mattina, JAGC, USN.
**For Appellee:** Maj Paul Ervasti, USMC.

**17 June 2014**

---
### OPINION OF THE COURT
---

THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.

MODZELEWSKI[1], Chief Judge:

This case is before us for a third time. We begin with a brief recitation of this case's procedural posture. In our initial decision, *United States v. Kish (Kish I)*, No. 201100404, 2012 CCA LEXIS 728 (N.M.Ct.Crim.App. 29 Mar 2012) (*per curiam*), we set aside a finding of guilty as to one specification, dismissed that specification, and affirmed the remaining

---

[1] Former Chief Judge Modzelewski participated in the decision of this case prior to detaching from the court.

findings of guilty. We also set aside the sentence and authorized a rehearing. Following that rehearing, we affirmed the sentence as approved by the convening authority (CA). *United States v. Kish (Kish II)*, No. 201100404, 2012 CCA LEXIS 682 (N.M.Ct.Crim.App. 31 Aug 2012) (*per curiam*). After filing a petition in the Court of Appeals for the Armed Forces (CAAF), the appellant subsequently filed a motion to attach two statements. Those statements were from two Marine junior officers who had attended a training session given by the military judge about two weeks after the appellant's resentencing hearing.

The CAAF granted the appellant's motion to attach, granted the petition, set aside this court's decision in *Kish II*, and ordered a hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A 1967), to "make findings of fact and conclusions of law related to what, if any, statements the military judge made on or about June 21, 2012, at a Professional Military Education meeting with junior officers regarding the practice of military justice." *United States v. Kish* (*Kish III*), 72 M.J. 158 (C.A.A.F. 2013) (summary disposition). The *DuBay* hearing concluded on 15 July 2013, and the record was subsequently docketed with this Court for the third time. Additional facts regarding the procedural posture of this case are incorporated below.

**Factual and Procedural Background**

The appellant was a canvassing recruiter assigned to Recruiting Substation (RSS) Oswego, New York, in 2009. Following an investigation into his relationship with a prospective recruit, the appellant was charged with four specifications of failing to obey a lawful general order, in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892, by the following actions: engaging in an inappropriate relationship with AS, a prospective recruit applicant; providing alcohol to AS, who was under the legal drinking age of twenty-one; using a Government vehicle for unauthorized purposes; and, engaging in an inappropriate relationship with GD, also a prospective recruit applicant.

A special court-martial comprised of members with enlisted representation convicted the appellant, contrary to his pleas, of all four specifications and sentenced him to nine months of confinement, reduction to pay grade E-1, and a bad-conduct discharge. The CA approved the sentence as adjudged.

2

On initial appeal, the appellant assigned five errors. Most importantly for our purposes here on remand, the appellant from the inception of his appeal contended that the military judge abandoned his impartial role and that the appellant was thereby denied a fair trial. In support of that assignment of error (AOE), the appellant relied primarily on the military judge's exceptionally lengthy examination of AS, a Government witness and the subject of two specifications. As further evidence of the military judge's partiality, the appellant also pointed to injudicious comments made by the military judge during trial, soliciting character evidence over the objection of trial defense counsel, allowing members to state questions aloud, engaging in a dialogue with members regarding evidentiary matters, and allowing improper sentencing argument over defense objection.

In *Kish I*, we relied upon the strong presumption that a military judge is impartial in the conduct of a judicial proceeding, citing to *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001). Noting that "the military judge needlessly interjected himself into the examination of witnesses and engaged in lengthy and largely irrelevant questioning," we nevertheless concluded that "his actions were not so egregious that a reasonable member of the public would question the legality, fairness and impartiality of the court-martial." *Kish I*, 2012 CCA LEXIS 728 at *6.

Moreover, we noted that the military judge's most unusual conduct involved his commandeering the direct examination of AS, and that this court dismissed one of the two specifications involving AS for factual insufficiency. Thus we concluded that even if the military judge had abandoned his impartial role in his examination of AS, our action setting aside the conviction involving AS mitigated the possibility of any prejudice. *Id.* at 6-7.

Upon remand for re-sentencing, the appellant and the CA agreed that the appellant would elect sentencing by military judge and waive any administrative discharge board, and in return the CA would suspend a bad-conduct discharge if adjudged. On 6 June 2012, the same military judge against whom the appellant had earlier complained presided over that sentence rehearing, without challenge or objection by the defense.[2] The

---

[2] The Government contends that the appellant's failure to challenge the military judge at the resentencing hearing somehow vitiates his claim of actual or apparent bias at his earlier contested trial. We disagree. Upon remand for sentencing, the appellant had negotiated a favorable agreement

3

military judge sentenced the appellant to four months of confinement, reduction to pay grade E-1, and a bad-conduct discharge.[3]

Two weeks after the sentence rehearing, on 21 June 2012, the military judge presented a Professional Military Education (PME) lecture to five "summer funners," Marine law school students on active duty for the summer. In his two-hour lecture, the military judge spoke at length about the responsibilities of trial counsel and for a shorter period of time about defense counsel duties. Two of the officers who attended the PME were troubled by some of his comments, and drafted statements summarizing those particular comments.

The appellant petitioned the CAAF following our action on his sentencing re-hearing, and subsequently filed a motion to attach the statements from the two law students. The CAAF granted his motion to attach, granted the petition, set aside our decision, and ordered a *DuBay* hearing to determine what the trial judge actually said at the PME lecture. The findings of fact from the *DuBay* hearing are attached to this opinion as an Appendix.

## Principles of Law

"'An accused has a constitutional right to an impartial judge.'" *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (quoting *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001)). The appellant must clear a "high hurdle" to prove that a military judge was partial or appeared to be so, as the law establishes a "strong presumption" to the contrary. *Quintanilla*, 56 M.J. at 44.

RULE FOR COURTS-MARTIAL 902, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) recognizes the constitutional right to an impartial judge and provides two bases for disqualification of a military judge. R.C.M. 902(b) enumerates specific circumstances indicative of actual bias that require disqualification. R.C.M. 902(a) provides for disqualification where the evidence does not

---

that protected him from a punitive discharge; he had already completed his confinement and could be compelled to serve no more. His failure to challenge the military judge at the re-sentencing hearing does not abrogate his claim of judicial partiality at the earlier trial.

[3] The CA approved the sentence and, except for the discharge, ordered it executed. Having previously affirmed the findings, and with no new assignments of error, this Court affirmed the sentence as approved by the CA. *Kish II*, 2012 CCA LEXIS 682 at *2.

4

establish actual bias, but the circumstances nonetheless warrant disqualification based upon a reasonable appearance of bias.[4] "The appearance standard is designed to enhance public confidence in the integrity of the judicial system." *Quintanilla*, 56 M.J. at 45 (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988)).

"[W]hen a military judge's impartiality is challenged on appeal . . . the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." *Martinez*, 70 M.J. at 158 (citation and internal quotation marks omitted). The appearance of impartiality is reviewed objectively and is tested under the standard set forth in *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982): "Any conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification." (Citation and internal quotation marks omitted).

Under Article 46, UCMJ, and MILITARY RULE OF EVIDENCE 614, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), military judges have wide latitude to ask questions of witnesses called by the parties to clear up uncertainties in the evidence or to develop the facts. *United States v. Acosta*, 49 M.J. 14, 17-18 (C.A.A.F. 1998). Furthermore, "[n]either Article 46 nor Mil.R.Evid. 614 precludes a military judge from asking questions to which he may know the witness' answer; nor do they restrict him from asking questions which might adversely affect one party or another." *Id.*

However, the military judge walks a "tightrope" in examining a witness. *United States v. Ramos*, 42 M.J. 392, 396 (C.A.A.F. 1995). He may elicit or clarify relevant information to assist the court-martial members in their deliberations, but must do so in a way that "'scrupulously avoid[s] even the slightest appearance of partiality.'" *Id.* (quoting *United States v. Shackelford*, 2 M.J. 17, 19 (C.M.A. 1976)). Members expect trial and defense counsel to be partisan advocates and will view the presentation of evidence and arguments by counsel in that light. *See United States v. Grandy*, 11 M.J. 270, 277 (C.M.A. 1981). On the other hand, they expect the judge to be

---

[4] The appellant has alleged both actual and apparent bias. Upon our *de novo* review of the conclusions of law in the Appendix, we are not persuaded that this military judge bore an actual, personal bias against the appellant, and thus limit our analysis to the issue of apparent bias under R.C.M. 902(a).

impartial, and if he does take sides, "the members can hardly avoid being influenced substantially by *his* advocacy."  *Id*. (emphasis in original).

## Discussion

At the direction of the CAAF, we now review *Kish I, Kish II,* and the *DuBay* record in determining whether the trial judge was disqualified based on his conduct at trial and his post-trial comments.

We will not re-state here in significant detail the Findings of Fact (FoF) from the *DuBay* hearing, which are captured in the Appendix to this opinion and adopted for the purposes of this opinion.  What is germane to our review and analysis of this record can instead be briefly summarized.  The trial judge, by his own admission, adopted the persona of a "hard-charging prosecutor" from the outset of the lecture and addressed the Marine law students from the perspective of a seasoned trial counsel.  An overarching theme of his lecture was this: it is very difficult to get convictions in a court-martial; trial counsel therefore need to be aggressive in preparing and presenting their case; they need to overwhelm members with a tremendous volume of evidence; and they need to pursue convictions with passion and zeal.  Additionally, the military judge communicated a general impression that he believed trial counsel were underperforming, insufficiently zealous, or deficient in preparation of their cases.

With these comments as backdrop, we now review the military judge's conduct in the appellant's trial.  From his initial appeal to this court, the appellant has maintained that the military judge abandoned his neutral and impartial role during the court-martial, principally through his extensive examination of AS, the Government's second witness and the subject of two of the four specifications.  Trial counsel began his direct examination of AS by asking her 110 questions.  Those questions established both the nature of her social relationship with the appellant and the fact that the appellant had provided her with alcohol.  At that point, the military judge interrupted the direct examination and proceeded to ask the next 174 questions.  Although the military judge briefly turned the examination back over to trial counsel, he cut in again on two occasions, and ultimately took the direct examination to its close.  After the military judge concluded his examination, he told trial counsel, "Go ahead," to which the trial counsel responded, "That is all the questions I have, sir."  Record at 253.  During the direct

6

examination of AS, the military judge asked a total of 234 questions.

Moreover, the substance of the judge's questions was also problematic. When he commandeered the direct examination of AS, she had just begun to recount an incident in which she, the appellant, and another young woman (CB) were all in the appellant's bed at his apartment. It was at this juncture that the military judge first interrupted, and he inquired in exhaustive and frequently inane detail into an incident of uncharged misconduct, in which the appellant engaged in sexual intercourse with CB in the presence of AS.

Both in sheer number and in content, the military judge's questions went beyond what was needed to "clear up uncertainties" or "develop the facts further." *See Ramos*, 42 M.J. at 396. Nor was this the type of "limited exchange" between military judge and witness that the CAAF found acceptable in *United States v. Foster*, 64 M.J. 331, 337 (C.A.A.F. 2007).

A reasonable person who observed or had knowledge of the trial judge's conduct in *Kish I* and the comments he made during his PME lecture would have a serious question as to the fairness and impartiality of the court-martial. Said another way, such a person would have viewed the entire *Kish* trial quite differently in light of the military judge's PME lecture. That observer may well have concluded that, by hijacking the direct examination of AS, the military judge was telegraphing a message that the trial counsel was not aggressive enough and was not overwhelming the members with an avalanche of evidence, as he exhorted the Marine law students to do. It would thus appear that the military judge became a second prosecutor to show trial counsel "how it should be done."

In elbowing the prosecution aside to conduct his own exhaustive direct examination of AS on the minutiae of an uncharged sexual act, the military judge fell off the judicial tightrope and created an appearance of partiality. *See Ramos*, 42 M.J. at 396.

On the unique facts of this case, we find a nexus between the military judge's conduct during the appellant's trial and his later comments detailed in the Appendix. Viewed in tandem, these give rise to an appearance of bias in the appellant's case.

7

## Remedy

R.C.M. 902(a) does not mandate a particular remedy in situations where a military judge should have recused or disqualified himself. In *Quintanilla*, the CAAF adopted the three-part *Liljeberg* test for determining whether a conviction should be reversed when a judge erroneously fails to recuse or disqualify himself:

> (1) What is the risk of injustice to the parties in the particular case?
> (2) What is the risk that the denial of relief will produce injustice in other cases?
> (3) What is the risk of undermining the public's confidence in the judicial process?

*Quintanilla,* 56 M.J. at 80-81 (citing *Liljeberg*, 486 U.S. at 864).

First, the risk of injustice to the parties is high. Judges are invested with extraordinary discretion on countless matters that have significant consequences for the parties in a trial. Putting aside for a moment the issue of the direct examination of AS, the judge on numerous other occasions commented on the evidence, asked questions of other witnesses, and ruled upon objections in a manner that may have contributed to the findings or the sentence in this case. All those decisions, comments, and actions are called into question by the appearance of bias.

Secondly, while denial of relief in this case will not itself produce an injustice in other cases, granting relief will have the salutary effect of reinforcing the demand for judicial impartiality.

Thirdly, and most critically, we turn to the question of the public's confidence in our judicial process. In light of the military judge's conduct during this trial, coupled with his public remarks, a reasonable member of the public would conclude that this military judge had shed his robe of judicial neutrality in the case of this particular accused. We find that the military judge's conduct warrants a remedy to vindicate the public's confidence in the military justice system.

8

## Conclusion

Accordingly, the findings and sentence are set aside.  A rehearing is authorized.  This action renders moot the appellant's other assignments of error.

Chief Judge MITCHELL and Judge FISCHER concur.

For the Court

R.H. TROIDL
Clerk of Court

## Appendix to United States v. Kish
### DuBay Hearing: United States v. Kish

### Background

On 14 March 2013, the Court of Appeals for the Armed Forces ordered a hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967), to make findings of fact and conclusions of law related to what, if any, statements the trial judge made on or about 21 June 2012, at a Professional Military Education (PME) meeting with junior officers regarding the practice of military justice.  That hearing concluded on 15 July 2013 at Marine Corps Base, Quantico.

**Evidence Presented:** The presiding *DuBay* judge heard testimony from the five Marine law students[5] who attended the PME, from the trial judge himself, and from a former Marine judge advocate who was assigned to the defense office at the time of the PME. Additionally, the *DuBay* judge admitted the transcript from a recusal hearing in *United States v. Bremer*,[6] held one week after the PME, at which all five Marine law students also testified. Finally, the *DuBay* judge admitted a redacted version of a Preliminary Inquiry Officer (PIO) report ordered by the Chief Judge, Department of the Navy (CJDoN) to inquire into the PME lecture.  That PIO report contained statements from all five Marine law students and the trial judge, taken a week after the PME lecture.

**Amended Findings**: Upon our review of the record of the hearing, we approve the *DuBay* judge's findings of fact (FoF), with the exception of FoF 2, 16, 25, 31-34, and 39, which we find to be clearly erroneous (16)[7] or irrelevant for the purposes of the

---

[5] The Marine Corps routinely assigns Marine officers who are currently attending law school to summer assignments at Marine Corps installations. These officers include both Law Education Program officers, who have previous experience as commissioned officers, and student program officers, who have been commissioned while in law school and for whom these assignments may be their first active duty experience.  We refer to both groups as "Marine law students."

[6] 72 M.J. 624 (N.M.Ct.Crim.App. 2013), *remanded to* No. 201200472, 2014 CCA LEXIS 321, unpublished op. (N.M.Ct.Crim.App. 23 Jan 2014).

[7] To the extent that FoF 16 suggests that LtCol Palmer's PME comments did not address dissatisfaction on the part of Congress and the Commandant of the Marine Corps relative to the prosecution of courts-martial, we find this FoF clearly erroneous.  *See* FoF 21 and 23 *infra.*

inquiry (2, 25, 31–34, 39).[8]  Additionally, we augment the *DuBay* judge's findings with findings of our own.  We do so for the sake of general completeness, but also to explore a perceived link between the trial judge's PME lecture and the Heritage Brief/Unlawful Command Influence (UCI) motion litigated the previous week in the case of *United States v. Howell*.[9]  That apparent link was highlighted both in a memo from CJDoN and in one Marine law student's statement to the PIO,[10] but was not addressed by the *DuBay* judge.  For ease of reading, we have incorporated the *DuBay* judge's findings of fact with our own.[11]

We derive our additional findings of fact from the original statements submitted by two Marine law students (Appellate Exhibit XCVI at 110-13), the statements given to the PIO, the testimony at the *Bremer* recusal hearing, and the testimony at the *DuBay* hearing itself.  Moreover, to the extent necessary to establish relevant facts, we take judicial notice of the timeline established in *Howell* regarding the Heritage Brief and the UCI motion in that case, as it relates to the issue now before us.

## Findings of Fact

*1.  In June 2012, Lieutenant Colonel* [LtCol] *Robert Gregory Palmer, U.S. Marine Corps, was assigned to the Marine Corps Recruit Depot (MCRD), Parris Island, South Carolina, as a military judge in the Southern Circuit, Navy-Marine Corps Trial Judiciary.  At that time, he had been so assigned for approximately three years.  As the military Judge assigned to MCRD, Parris Island,* [LtCol] *Palmer presided at almost all courts-martial held at MCRD, Parris Island, as well as Marine Corps Air Station (MCAS), Beaufort, South Carolina.*

### The Howell UCI Motion and the Stay

2.  On 11 June 2012, LtCol Palmer, as the trial judge, presided over an Article 39(a), UCMJ, session in *United States v. Howell*.  At that hearing, the parties litigated a defense motion alleging UCI based on the Heritage Brief given by the Commandant of the

---

[8] Additionally, we find FoF 27 to be erroneous in part, but parse that issue in FoF 35 below.

[9] *United States v. Howell*, No. 201200264, 2014 CCA LEXIS 321, unpublished op. (N.M.Ct.Crim.App. 22 May 2014).

[10] Appellate Exhibit XCVI at 32.

[11] The *DuBay* judge's findings, which have been re-numbered for incorporation, are those in italics.

Marine Corps (CMC) onboard Parris Island on 19 April 2012.  In support of its motion, the defense counsel provided the trial judge with the video and audio recordings of the Parris Island brief, and numerous print media articles covering the CMC's tour.  After argument on the motion, the trial judge denied the defense motion to dismiss, finding that the defense had not met its initial burden of showing some evidence of UCI, in that it demonstrated no nexus between the CMC's brief and the case at trial. *Id.*

3.  Following *voir dire* the next day, the defense renewed its objection, noting that the members' responses had established the "missing" nexus.  LtCol Palmer again denied the defense motion, finding no actual or apparent UCI based on the CMC's Heritage Brief.  *Id.* at *18.

4.  The defense in *Howell* filed an extraordinary writ with NMCCA on 13 June 2012 seeking review of LtCol Palmer's ruling on the UCI motion.  On 14 June 2012, this court issued a stay in *Howell*.  *Id.* at *18-19.

5.  Second Lieutenant (2ndLt) AC, a Marine law student assigned to the defense section at MCRD Parris Island, observed the litigation of the UCI motion in *Howell*, and assisted in drafting the extraordinary writ.  AE XCVI at 32, 34.

**The Invitation to Provide PME**

*6.  On 19 June 2012,* [LtCol] *Palmer presided at the arraignment in United States v. Aboraia.  Captain* [Capt DC]*, U.S. Marine Corps, a student judge advocate assigned to the defense section, attended the arraignment as a spectator.  Because of problems with the trial counsel's representation of the United States at that session,* [Capt DC] *approached* [LtCol] *Palmer soon thereafter and asked if he would provide a* [PME] *session to the Marine officer law students (student judge advocates) assigned to the MCRD, Parris Island, and MCAS, Beaufort law centers.* Footnote omitted.

*7.  In requesting the training,* [Capt DC] *asked* [LtCol] *Palmer to "provide training and advice to new judge advocates," or words to that effect.  Although* [Capt DC]*'s request was spurred by his observation of a trial counsel's problematic presentation before* [LtCol] *Palmer,* [Capt DC] *did not ask* [LtCol] *Palmer to give the PME to the student judge advocates from the perspective of a trial counsel.*

*8.* [Capt DC]*'s request came after witnessing the problematic arraignment and* [LtCol] *Palmer assumed a certain context to*

12

[Capt DC]'s request. *Specifically,* [LtCol] *Palmer believed* [Capt DC] *requested a PME on how to be a successful trial counsel and avoid problems such as those they had both just witnessed.* [LtCol] *Palmer agreed to conduct the training and tasked* [Capt DC] *with assembling the student judge advocates for the PME.* [LtCol] *Palmer believed that* [Capt DC] *would share the purpose and context of the training – as* [LtCol] *Palmer understood it – with the other student judge advocates.*

9. *In assembling the group,* [Capt DC] *told the other student judge advocates that* [LtCol]*Palmer would be giving a PME about what to expect as a judge advocate in the Marine Corps.* [Capt DC] *also provided the other student judge advocates a time and location for the PME.*

10. *It is part of a military judge's duties to train the counsel that appear before that military judge in court. As the only military judge in the Southern Circuit assigned to MCRD, Parris Island and MCAS, Beaufort,* [LtCol] *Palmer had provided dozens of PME sessions to other counsel during his prior three years on station as the military judge. There was no evidence presented at the hearing of any issues with the content of any PME previously conducted by* [LtCol] *Palmer.*

**The PME Lecture**

11. [LtCol] *Palmer provided the PME on 21 June 2012 in the courtroom aboard MCAS, Beaufort. Five Marine Corps student judge advocates attended:* [Capt DC], [Capt NC], [2ndLt AC], [2ndLt DL], *and* [2ndLt AN]. *All five individuals were student judge advocates on deck at MCRD, Parris Island or MCAS, Beauport, and all were assigned to the trial counsel, defense counsel, or legal assistance shops in their summer assignment.*

12. *The PME lasted from 0800 until 1000.* [2ndLt AC] *arrived a few minutes late and fell asleep for brief periods during the PME, but the remaining student judge advocates were present and attentive for the entire presentation.*

13. *At no time before or during the PME did* [LtCol] *Palmer provide any context to his comments. After the PME, and in the course of this matter,* [LtCol] *Palmer stated he presented the PME "from the perspective of what it really takes to be a hard-charging prosecutor" and that during the PME "he used exaggerations to present the counsel with the mindset of an aggressive trial counsel." See AE 88, page 4.*

14. [LtCol] *Palmer believed that "the context of the course of instruction were clear and that these comments would be seen as*

13

*coming from the prospective of a hard-charging trial counsel seeking justice." See AE 88, page 5.* [LtCol] *Palmer did not intend to teach the PME from the perspective of a military judge and did not believe that the student judge advocates would view his comments as such.*

15. Despite LtCol Palmer's failure to provide any context for his comments, all the law students concur that the PME focused largely on the role of a trial counsel, how to be effective as a trial counsel, and how to avoid common trial counsel errors and deficiencies. AE XCVI at 31, 39, 43, 48-49, 56.

16. [LtCol] *Palmer taught the PME from the well of the courtroom and not the bench, while the student judge advocates sat a counsel's tables. He taught with animation, hyperbole, and irony, using jokes as well as personal anecdotes in an attempt to keep the student judge advocates attentive and engaged.*

**General Parameters of PME Lecture**

17. [LtCol] *Palmer covered numerous topics during the PME, including the impending administrative re-organization of Marine Corps legal services, as well as the substantive military justice topics of charging and speedy trial. He spoke for approximately 45 minutes on how to properly complete a charge sheet, reviewing the form block-by-block.*

18. He covered in considerable detail how to fill out each block, who would typically fill out each block, and the import of completing each block (i.e., preferral of charges triggering the R.C.M. 707 requirements). As he discussed each block, LtCol Palmer mixed in anecdotes and advice from his career, as well as common mistakes made. AE XCVI at 48-49, 53.

19. LtCol Palmer discussed his perception that the quality of representation by trial counsel had declined in recent years and highlighted areas in which he had seen deficiencies. AE XCVI at 43, 53. He used his own experiences as trial counsel to emphasize how important and difficult the job is and how much effort prosecutors need to dedicate. He emphasized that trial counsel must overwhelm their opponents with zeal and thorough preparation. LtCol Palmer cited examples from recent cases to illustrate problems with trial counsel. *Id.* at 43. He told the law students that trial counsel should be fired if they try ten cases and get three or four acquittals. *Id.* at 36, 50.

20. While discussing the duties of trial counsel, LtCol Palmer spoke at some length about "jury" members. He expressed his

14

frustration with panel members and spoke of them in a mocking manner: he made those remarks while detailing for the law students his perception that it is difficult to convince juries to convict and that trial counsel need to be prepared to overwhelm the members with evidence.

**Specific comments that LtCol Palmer made during the PME.**

21.  Although the session was not recorded, and recollections among the six officers in the room differ slightly, the evidence establishes that LtCol Palmer made the statements contained in FoF 24, 27, and 30, and also used approximately the following language: *Congress is not happy with the way that the Marine Corps is handling criminal cases.*

*22.  [LtCol] Palmer made the statement about Congress in the context of talking about the reorganization of Marine Corps legal services and proposed changes to the Uniform Code of Military Justice, including changes to Article 120.*

23.  In conjunction with his remarks about Congress and the re-organization of Marine Corps legal services, LtCol Palmer also discussed the CMC's recent initiative on sexual assault and CMC's dissatisfaction with military justice.  AE XCVI at 53-54.

*24.  During the PME,* [LtCol] *Palmer made the following statements:*

    a. *You must have a willing suspension of disbelief of the victims once the convening authority has decided to proceed with the charges.*
    b. *The defendant is guilty.  We wouldn't be at this stage if he wasn't guilty.*
    c. *As trial counsel, it is your job to prove the defendant is guilty with the fullest veracity.  Don't hold back.  Once convicted, we need to crush these Marines and get them out.*
    d. *Defendants are scumbags.*
    e. *If a trial counsel loses a child pornography case, that trial counsel will go to hell.*

*25.  [LtCol] Palmer made each of the [above] statements [. . .] in the context of the mindset he believes a trial counsel must have on every case in order to effectively represent the United States.*

26.  Most of the Marine law students understood that these comments were aimed at them as prospective trial counsel and viewed his remarks in that context.  AE XCVI at 31, 39, 43, 53,

15

56.  When LtCol Palmer pointed to the defense table and stated that the accused is guilty if he's sitting there, the Marine law students largely understood him to mean that a trial counsel must adopt that mindset in order to zealously represent the Government.  *Id*. at 39, 55, 110, 112; AE XCVIII at 142-43.

*27.  During the PME,* [LtCol] *Palmer made the following statements:*

> a. *Jury members are stupid, knuckle-dragging morons that need to have the drool wiped away from their mouths. I don't hate them, I despise them.*
> b. *Juries don't have to follow the law and they know it.*

*28.* [LtCol] *Palmer made the statements in* [FoF (30)] *in the context of how he believes a trial counsel must approach meeting their burden of proof to members beyond a reasonable doubt at trial.  He was attempting to convey that a trial counsel can approach the burden of proof too lightly; instead a trial counsel must prove even the most basic of facts to the members.*

29.  Although some of the law students found LtCol Palmer's comments about jury members offensive or surprising, they generally understood him to be making the point that jury members are not legal experts or lawyers, do not understand the law, and don't have time in trial to become expert on the law, so that a trial counsel must try to convince them to convict with an overwhelming volume of evidence.  *See* AE XCVI at 40, 43; *DuBay* Hearing Record at 127-28.

*30.  During the PME,* [LtCol] *Palmer made the following statements:*

> a. *It is extremely difficult to convict a military accused under military law.*
> b. *If you are a trial counsel prosecuting a child pornography case and the accused is found not guilty, you will go to hell.*

*31.* [LtCol] *Palmer made the statement in* [FoF 30] *in the context of how a trial counsel must approach the responsibility of prosecution.*

*32.* [LtCol] *Palmer did not state that a trial counsel needs to list any charges on the charge sheet just to get the charges before the members, even if the elements of the charges cannot be proven, or words to that effect.*

*33. During the PME,* [LtCol] *Palmer told a story about a past case in which he acted as trial counsel and the accused received a less severe result that that which* [LtCol] *Palmer had desired.* [LtCol] *Palmer stated words to the effect that "maybe I'll just kill him when he get out [of confinement]."*

*34.* [LtCol] *Palmer offered the student judge advocates numerous opportunities to ask questions during the PME. The student judge advocates did not ask questions.*

*35.* [LtCol] *Palmer did not discuss cases* [or] *accused, ~~or issues pending before him.~~[12] He did not discuss his judicial decision making. He did, however, discuss at least one past case in which he had presided as military judge, mostly discussing the defense counsel's admirable trial performance.*

**The Aftermath of the PME Lecture**

*36. During the PME,* [2ndLt AC] *was bothered by comments made by* [LtCol] *Palmer. After the PME,* [2ndLt AC] *returned to the defense section where she was assigned and reported her recollection of the comments to her supervising defense counsel, including (four Marine Corps Captains), (hereinafter referred to together as "supervisory defense counsel.)"* [2ndLt AC] *then completed an affidavit memorializing her recollection of the PME as she had not taken notes.*

37. In her statement, 2ndLt AC listed those comments that she found troubling – basically, those specific statements identified in FoF 24, 27, 30, and 33 *supra*. AE XCVI at 110-11.

*38. Prior to attending the PME,* [2ndLt AC] *had assisted supervisory defense counsel in drafting motions heard by* [LtCol] *Palmer and an extraordinary writ challenging* [LtCol] *Palmer's ruling in a case. Based on those experiences and other observations of* [LtCol] *Palmer in court,* [2ndLt AC] *had formed the opinion prior to the PME that* [LtCol] *Palmer, as a military judge, was partial to the government.*

*39. After speaking with* [2ndLt AC]*, supervisory defense counsel contacted the other student judge advocates who attended the PME in an attempt to confirm* [2ndLt AC's] *account of the PME.*

---

[12] We find the lined-out portion of the FoF to be clearly erroneous and decline to adopt it. LtCol Palmer discussed Congressional and CMC dissatisfaction with the Marine Corps' prosecution of cases (FoF 21, 23 *supra*), which were issues pending before him in *Howell* at the time of his PME lecture: the case was stayed pending this court's review of his ruling on the UCI/Heritage Brief motion.

40. In response, 2ndLt AN also gave a written statement, but the other three declined to do so, in part because of concerns that the statement from 2ndLt AC mischaracterized the training. *DuBay* Hearing Record at 71, 103.

41. LtCol Palmer's comments during that PME lecture quickly became a source of considerable controversy and litigation. As a result of the PME, defense counsel filed a Motion to Recuse LtCol Palmer in the case of *United States v. Bremer*. The next week, LtCol Palmer presided over a lengthy Article 39(a) session in *Bremer* that explored the content and tone of his PME lecture.[13] All five Marine law students testified at the *Bremer* Article 39(a) session.

42. The CJDoN, ordered a preliminary inquiry into the PME pursuant to Judge Advocate General Instruction 5803.1D (1 May 2012). That inquiry was conducted in the immediate wake of the PME lecture and the *Bremer* recusal hearing. All five Marine law students and LtCol Palmer provided statements to the PIO, which are included in the *DuBay* record.

43. LtCol Palmer left the trial bench in late July 2012.

**Differing Recollections as to Content, Context, and Tone**

44. Trial counsel in *Bremer*, the PIO, and the *DuBay* judge all treated 2ndLt AC's recollections skeptically, portrayed her as somehow biased against LtCol Palmer by her experience in the defense section, and implied or stated that she was tired, inattentive, or the only person in the PME lecture who recalled certain statements.

45. The record, however, confirms that 2ndLt AC's recollection as to the **content** of the statements was largely accurate. From her initial statement forward, she alleged that LtCol Palmer made approximately eight controversial statements, broken down in segments in FoF 21, 24, 27, 30, and 33 *supra*. Of the eight statements that she alleged in her initial affidavit, seven are validated by at least one other officer in the room and almost all are admitted to by LtCol Palmer. Only one of the eight statements that 2ndLt AC alleged in her original statement and subsequent statements is not supported by any other officer in the room.[14]

---

[13] *See Bremer*, 72 M.J. at 628 (finding that the judge erred in not recusing himself and remanding for resentencing).

[14] *See* FoF 32 *supra*. 2ndLt AC alleged that LtCol Palmer stated: "Trial counsel needs to list any charges on the charge sheet as long as they have

46.  Rather than biased, 2ndLt AC may simply have been more alert to the gravity and possible import of LtCol Palmer's comments because of her familiarity with the UCI motion in *Howell*, litigated the previous week, and the subsequent writ. In her statement to the PIO, 2ndLt AC identified the remarks made regarding Congress and the CMC (FoF 21, 23) as particularly problematic in light of LtCol Palmer's ruling on the UCI motion. AE XCVI at 32.

47.  Although the Marine law students' testimony and statements to the PIO reveal little disagreement about what was actually said, the law students differ greatly about the **context** of his comments.

> a. *While all five of the student judge advocates thought the information presented at the PME was helpful to their future practice,* [2ndLt AC] *and* [2ndLt CN] *questioned LtCol Palmer's fairness and impartiality after the PME.*

> b. 2ndLt AC complained immediately with recitation of those comments she found offensive.  In writing those statements down without any frame of reference to LtCol Palmer's lecture topics, 2ndLt AC appears to have lifted several of LtCol Palmer's statements out of context.  She consistently maintained throughout the investigation and inquiry that she doubted his ability to be fair and impartial.  AE XCVI at 30, 35.

> c. *While* [2ndLt CN] *thought the majority of the PME was helpful, he thought that some of* [LtCol] *Palmer's comments during the PME were troubling.  For example,* [2ndLt CN] *took* [LtCol] *Palmer's comment that "an accused is guilty or he wouldn't be here" to be* [LtCol] *Palmer's personal opinion.*

> d. 2ndLt DL recalled the same comments that 2ndLt AC complained of, but provided more backdrop and context to the comments.  In context, he was not disturbed by the comments, stating "I did not interpret him to be speaking about the role of a judge at any time, and I never felt that there was any partiality displayed concerning his duties as a judge."  AE XCVI at 56.

---

some evidence to support them, even if some elements cannot be proven in order to present the charges to the jury to get a conviction."  The other Marine law students recall LtCol Palmer discussing the topic of what to charge and supporting evidence, but all deny that he said to charge offenses without adequate proof.

e. Capt DC and Capt NC failed to recall many of the controversial comments, and described the training as helpful in content and unremarkable in tone.  *DuBay* Hearing Record at 99, 102, 124, 128.

## Conclusions of Law

"An accused has a constitutional right to an impartial judge."  *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (quoting *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999).

**The Code of Judicial Conduct**:  The Department of the Navy has expressly adopted the American Bar Association Model Code of Judicial Conduct to the extent that it does not conflict with the statutes, regulations, or the Department's rules governing professional responsibility.  JAGINST 5803.1D at 6.

Two sections of the Canons are of particular relevance to this case.  Rule 1.2 of the ABA Model Code provides: "A judge shall act at all times in a manner that promotes public confidence in the . . . impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

Rule 3.1 provides that "[a] judge may engage in extrajudicial activities, except as prohibited by law or this Code.  However, when engaging in extrajudicial activities, a judge shall not: . . . (C) participate in activities that would appear to a reasonable person to undermine the judge's independence,* integrity,* or impartiality* . . . ."

However, the ABA Model Code standards generally are regarded as principles to which judges should aspire and are enforced primarily through disciplinary action, rather than through disqualification.  *United States v. Quintanilla*, 56 M.J. 37, 42–43 (C.A.A.F. 2001).  Actions that violate the Model Code "do not necessarily provide a basis either for disqualification of a judge or reversal of a judgment unless otherwise required by applicable law."  *Id*. at 43 (citation omitted).

**R.C.M. 902:**  Instead, we turn to R.C.M. 902, which recognizes the constitutional right to an impartial judge and provides two bases for disqualification of a military judge.  Because R.C.M. 902 parallels the statute governing disqualification of federal civilian judges, 28 U.S.C. § 455, we consider the standards developed in the federal civilian courts when addressing disqualification issues arising under R.C.M. 902 as well as our military justice case law.  *Id*. at 44.

20

R.C.M. 902(a) provides for a general rule of disqualification for certain appearances of partiality, even though the evidence does not establish actual bias. *Id.* at 45. "The appearance standard is designed to enhance public confidence public confidence in the integrity of the judicial system." *Id.* (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988).

In contrast, R.C.M. 902(b) enumerates specific circumstances connoting actual bias that require disqualification: those circumstances largely center on the military judge's relationship to a party, or extrajudicial involvement, or knowledge in a case.

Therefore, R.C.M. 902 requires consideration of disqualification under a two-step process. The first step asks whether disqualification is required under any of the specific circumstances listed in R.C.M. 902(b). If not, we then ask "whether the circumstances nonetheless warrant disqualification based upon a reasonable appearance of bias." *Quintanilla*, 56 M.J. at 45.

For purposes of our inquiry here, we limit ourselves to the issue of whether LtCol Palmer demonstrated actual bias in his comments during the PME lecture. We leave consideration of the equally important question of apparent bias for resolution in individual cases.[15]

**Actual bias:** R.C.M. 902(b)(1) provides for disqualification "[w]here the military judge has a personal bias or prejudice concerning a party . . . ." Several of LtCol Palmer's statements, standing alone, raise the issue of whether he harbors a personal bias or prejudice against the accused at any court-martial, i.e., referring to accused as "scumbags," speaking of the need to "crush" them, remarking that they are guilty if sitting at court-martial, and noting the difficulty of securing convictions. (FoF 27b, c, and d.)

These statements clearly reflect exceptionally poor judgment and invite questions regarding judicial temperament and professionalism. Nevertheless, considering the context provided by the law students in the room, we are convinced that LtCol Palmer intended his remarks to convey to the law students the perspective that he believed they must have to succeed as trial counsel. Said differently, we are convinced that he was voicing

---

[15] In addition to ordering a *DuBay* hearing in the instant case, the Court of Appeals for the Armed Forces remanded eleven cases to this court for further consideration after conclusion of our review here.

not his own biases or prejudices, but instead a mindset that he believes a junior counsel must adopt to be a tenacious and zealous advocate.  We conclude therefore that the evidence does not support a determination that LtCol Palmer was actually biased against accused servicemembers within the meaning of R.C.M. 902(b).  As noted above, we leave the issue of apparent bias for resolution in individual cases.